Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SLOAN, derivatively on behalf of META PLATFORMS, INC. f/k/a FACEBOOK, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| MARK ZUCKERBERG, DAVID M. WEHNER, NICK CLEGG, PEGGY ALFORD, MARC L. ANDREESSEN, ERSKINE B. BOWLES, SUSAN D. DESMOND-HELLMANN, REED HASTINGS, ANDREW W. HOUSTON, NANCY KILLEFER, ROBERT M. KIMMITT, SHERYL K. SANDBERG, PETER THIEL, and TRACEY T. TRAVIS, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| META PLATFORMS, INC. f/k/a FACEBOOK, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

1

2

## INTRODUCTION

Plaintiff Mark Sloan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Meta Platforms, Inc. f/k/a Facebook, Inc., ("Facebook" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Mark Zuckerberg ("Zuckerberg"), David M. Wehner ("Wehner"), Nick Clegg ("Clegg"), Peggy Alford ("Alford"), Marc L. Andreessen ("Andreessen"), Erskine B. Bowles ("Bowles"), Susan D. Desmond-Hellmann ("Desmond-Hellmann"), Reed Hastings ("Hastings"), Andrew W. Houston ("Houston"), Nancy Killefer ("Killefer"), Robert M. Kimmitt ("Kimmitt"), Sheryl K. Sandberg ("Sandberg"), Peter Thiel ("Thiel"), and Tracey T. Travis ("Travis") (collectively, the "Individual Defendants," and together with Facebook, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Facebook, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis for violations of Section 14(a) of the Exchange Act, and against Defendants Zuckerberg, Wehner, and Clegg for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Facebook, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Facebook's controlling shareholder, directors, and officers from November 3, 2016, through October 21, 2021 (the "Relevant Period").

2.     Facebook is Delaware corporation based in California. Facebook's products include one of the world's most heavily used social media platforms, the eponymous Facebook, as well as Instagram, an application ("app") for sharing photos, and Facebook Messenger and WhatsApp, apps for sending messages between users.

3.     Facebook primarily generates revenue by selling digital advertisement placements to those interested in advertising to the users of Facebook's products. Moreover, Facebook collects data about its users which is of interest to advertisers and gives advertisers the ability to specifically target demographics of their choosing based on this user data.

4.     During the Relevant Period, the Individual Defendants caused Facebook to publicly represent that it went to great lengths to adequately moderate content, ensuring the prompt removal of illegal and harmful content, as well as any other content that was contrary to Facebook's policies. Facebook further represented its commitment to keeping users safe and to apply its content policies uniformly across its multifaceted user base.

5.     However, these representations were untrue as leaked internal Company documents and the statements of Company whistleblowers would reveal.

6.     These sources demonstrate that Facebook's content moderation policies, or lack thereof, cause civil unrest; assist in the commission of crimes including drug trafficking, human trafficking, and violent extremism; result in harm to Facebook users; and are not applied uniformly, with high profile users treated more favorably despite public representations that they would not be. Moreover, Facebook personnel were well aware of these issues before they became public knowledge, but Facebook did not correct them. Instead, believing that more active content moderation would damage the Company's ability to generate advertising revenue, the Company chose to let these issues go substantially unaddressed. Further still, knowing of the harms posed by its products, the Company nevertheless was undertaking

efforts to target pre-teens, which the Company described as "a valuable but untapped audience," in order to get them to engage with the Company's products more actively (these actions collectively, the "Platform Content Misconduct"). In addition, Facebook knew that a substantial number of its accounts were fake and/or duplicates, yet improperly counted many of these accounts in measures of user activity. The Platform Content Misconduct and the inflated user figures made the Company appear more as if it were a more profitable and safer investment than it was, and artificially inflated the value of the Company's securities.

7.      The truth began to be revealed on September 13, 2021, when the *Wall Street Journal* began publishing a series of articles, dubbed the "Facebook Files," that revealed the truth concerning the Platform Content Misconduct. The "Facebook Files" cited the Company's internal documents obtained from a whistleblower who would later reveal herself as Frances Haugen, former Facebook employee. Subsequent articles in the "Facebook Files" series were released every day through and including September 17, 2021, revealing more and more about Facebook's deception surrounding the Platform Content Misconduct. These articles revealed , *inter alia*, the Company's internal awareness of the harm its products posed to users including making "body image issues worse for one in three teen girls," the Company's decision to do little to nothing about this, the Company's moderation policies applying more stringently to some users and less stringently to others (particularly high profile users), the Company's 2018 decision to alter its algorithm knowing it would lead more users to see objectionable and harmful content, the Company's apps were being used to facilitate drug and human trafficking, and the Company's inability to moderate content in line with its own stated policies and viewpoints. Then, on September 28, 2021, the *Wall Street Journal* published another article regarding the Company's targeting of pre-teens as a potential area to expand its business.

8.      The truth continued emerging on October 3, 2021, when the anonymous whistleblower revealed her identity in an interview on the *CBS News* show: *60 Minutes*. She was former Facebook project manager Frances Haugen, who herself would become something of a public figure due to publicly-coming forward with her concerns. In that interview, she stated that Facebook's actions have "shown it chooses profits over safety" and that "I don't trust that they're willing to actually invest what needs to be invested

to keep Facebook from being dangerous." Following this appearance, on October 4, 2021, *CBS News* published an article which disclosed that the Frances Haugen had filed eight whistleblower complaints with the SEC concerning Facebook misleading the investing public.

9.     Then, on October 21, 2021, after the market had closed, the *Wall Street Journal* published another article concerning Facebook, again relying on the Company's internal documents, that noted that duplicate accounts were "very prevalent" and that this phenomenon made Facebook's publicly reported user metrics, including the ratio of daily active users, "less trustable."

10.     On this news, the price of the Company's stock dropped from $341.88 per share at the close of trading on October 21, 2021, to $324.61 at the close of trading on October 22, 2021, a drop of $17.27, or approximately 5.1%. From the market's close on September 10, 2021 (the last trading day before the truth began emerging on September 13, 2021) to its close on October 22, 2021, the Company's stock dropped $54.08, or approximately 14.3%.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing or permitting the Company to engage in the Platform Content Misconduct.

12.     Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Facebook's business, operations, and policies. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; (3) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.     Furthermore, during the Relevant Period while the Company's stock was trading at artificially inflated prices due to the false and misleading statements at issue, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at artificially inflated prices, while two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining collective proceeds of over $2.5 billion. From June 1, 2021 until October 31, 2021, the Company repurchased approximately 71,270,000 shares of its own stock for about $24.6 billion. Given that, during this time, the Company's stock was only worth $324.61 per share, the price at close on October 22, 2021, the Company overpaid by over $1.4 billion.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company to multiple federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions") including one brought by the Ohio Attorney General against the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Vice President of Global Affairs and Communications, and has further still subjected the Company to the need to remedy the Platform Content Misconduct, undertake internal investigations, implement adequate internal controls over its financial reporting, suffer the losses from the waste of corporate assets, and suffer the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other,

and their not being disinterested and/or independent directors, a majority of Facebook's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District, and Facebook is headquartered in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Facebook common stock. Plaintiff has continuously held Facebook common stock at all relevant times.

### Nominal Defendant Facebook

24.     Facebook is a Delaware corporation with its principal executive offices located at 1601 Willow Road, Menlo Park, CA 94025. Facebook's shares trade on the NASDAQ under the ticker symbol "FB."

**Defendant Zuckerberg**

25.     Defendant Zuckerberg founded the Company in 2004 and has served as the Company's CEO since then. From 2012 onward, he has been Chairman of the Board. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 9, 2021 (the "2021 Proxy Statement"), as of March 31, 2021, Defendant Zuckerberg beneficially owned 2,770,698 shares of the Company's Class A common stock and 359,924,464 shares of the Company's Class B common stock,[1] with voting control over an additional 32,595,276 shares of the Company's Class B common stock. Thus, taken together, Defendant Zuckerberg has voting control over 57.7% of the Company's total voting power, making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Zuckerberg beneficially owned approximately $107 billion worth of Facebook stock.

26.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Zuckerberg received $25,288,265 in total compensation from the Company. This included $1 in salary and $25,288,264 in other compensation, consisting of the costs of providing Defendant Zuckerberg with private security and costs associated with Defendant Zuckerberg's personal use of private aircraft. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Zuckerberg received $23,415,973 in total compensation from the Company. This included $1 in salary and $23,415,972 in other compensation, consisting of the costs of providing Defendant Zuckerberg with private security and costs associated with Defendant Zuckerberg's personal use of private aircraft. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), Defendant Zuckerberg received $22,554,543 in total compensation from the Company. This included $1 in salary and $22,554,542 in other compensation, consisting of the costs of providing Defendant Zuckerberg with private security and costs associated with Defendant Zuckerberg's personal use of private aircraft. For the fiscal year ended December 31, 2017 (the "2017 Fiscal Year"), Defendant Zuckerberg received $8,852,366 in total compensation from the

---

[1] Holders of Class B common stock are entitled to ten votes per share compared to Class A common stock's one vote per share. Class B common stock automatically converts into Class A common stock if transferred under most circumstances, including an arms-length sale, and so is treated the same as Class A common stock herein for the purpose of calculating value.

Company. This included $1 in salary and $8,852,365 in other compensation, consisting of the costs of providing Defendant Zuckerberg with private security and costs associated with Defendant Zuckerberg's personal use of private aircraft. For the fiscal year ended December 31, 2016 (the "2016 Fiscal Year"), Defendant Zuckerberg received $5,765,832 in total compensation from the Company. This included $1 in salary and $5,765,831 in other compensation, consisting of the costs of providing Defendant Zuckerberg with private security and costs associated with Defendant Zuckerberg's personal use of private aircraft.

27.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Zuckerberg made the following sales of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| April 29, 2021 | 68,000 | $326.62 | $22,210,364 |
| April 30, 2021 | 68,000 | $327.17 | $22,247,220 |
| May 3, 2021 | 68,000 | $325.46 | $22,131,008 |
| May 26, 2021 | 52,700 | $327.94 | $17,282,385 |
| May 27, 2021 | 77,300 | $330.36 | $25,536,673 |
| June 2, 2021 | 63,105 | $329.64 | $20,801,679 |
| June 4, 2021 | 77,300 | $329.30 | $25,455,199 |
| June 8, 2021 | 77,300 | $335.36 | $25,923,173 |
| June 9, 2021 | 77,300 | $333.42 | $25,773,056 |
| June 10, 2021 | 77,300 | $331.63 | $25,634,689 |
| June 11, 2021 | 77,300 | $331.11 | $25,594,725 |
| June 14, 2021 | 77,300 | $333.69 | $25,794,005 |
| June 15, 2021 | 77,300 | $337.73 | $26,106,838 |
| June 16, 2021 | 77,300 | $333.21 | $25,757,287 |
| June 17, 2021 | 77,300 | $334.32 | $25,842,626 |
| June 21, 2021 | 77,300 | $330.42 | $25,541,234 |
| June 22, 2021 | 77,300 | $336.25 | $25,992,202 |

| | | | |
|---|---|---|---|
| June 24, 2021 | 77,300 | $343.48 | $26,551,158 |
| June 25, 2021 | 77,300 | $341.99 | $26,436,058 |
| July 1, 2021 | 77,300 | $350.82 | $27,118,231 |
| July 2, 2021 | 77,300 | $354.68 | $27,416,609 |
| July 6, 2021 | 77,300 | $354.04 | $27,367,369 |
| July 7, 2021 | 77,300 | $353.47 | $27,323,153 |
| July 8, 2021 | 77,300 | $345.64 | $26,717,662 |
| July 9, 2021 | 77,300 | $348.28 | $26,922,121 |
| July 12, 2021 | 77,300 | $352.37 | $27,237,969 |
| July 13, 2021 | 77,300 | $352.31 | $27,233,717 |
| July 14, 2021 | 77,300 | $350.92 | $27,125,806 |
| July 15, 2021 | 77,300 | $344.46 | $26,627,144 |
| July 16, 2021 | 77,300 | $343.15 | $26,525,649 |
| July 19, 2021 | 77,300 | $337.46 | $26,086,044 |
| July 20, 2021 | 77,300 | $339.27 | $26,225,339 |
| July 21, 2021 | 77,300 | $344.19 | $26,605,655 |
| July 22, 2021 | 77,300 | $348.53 | $26,941,446 |
| July 23, 2021 | 6,300 | $366.67 | $2,310,027 |
| July 23, 2021 | 56,000 | $366.76 | $20,538,840 |
| July 23, 2021 | 15,000 | $366.22 | $5,493,300 |
| July 26, 2021 | 77,300 | $371.77 | $28,738,207 |
| July 27, 2021 | 77,300 | $368.96 | $28,520,839 |
| July 28, 2021 | 77,300 | $372.33 | $28,781,418 |
| July 29, 2021 | 77,300 | $361.00 | $27,905,454 |
| July 30, 2021 | 77,300 | $357.20 | $27,611,714 |
| August 2, 2021 | 77,300 | $354.88 | $27,431,992 |
| August 3, 2021 | 77,300 | $350.60 | $27,101,380 |

Verified Shareholder Derivative Complaint

| | | | |
|---|---|---|---|
| August 4, 2021 | 77,300 | $356.21 | $27,534,878 |
| August 5, 2021 | 77,300 | $360.61 | $27,875,153 |
| August 6, 2021 | 77,300 | $363.48 | $28,097,004 |
| August 9, 2021 | 77,300 | $363.33 | $28,085,640 |
| August 10, 2021 | 77,300 | $361.90 | $27,974,715 |
| August 11, 2021 | 77,300 | $360.19 | $27,842,377 |
| August 12, 2021 | 77,300 | $360.41 | $27,860,002 |
| August 13, 2021 | 77,300 | $363.15 | $28,071,881 |
| August 16, 2021 | 77,300 | $362.38 | $28,012,205 |
| August 17, 2021 | 77,300 | $360.15 | $27,839,672 |
| August 18, 2021 | 77,300 | $357.81 | $27,658,635 |
| August 19, 2021 | 77,300 | $354.77 | $27,423,875 |
| August 20, 2021 | 77,300 | $357.41 | $27,627,715 |
| August 23, 2021 | 77,300 | $362.51 | $28,022,023 |
| August 24, 2021 | 77,300 | $365.35 | $28,241,477 |
| August 25, 2021 | 77,300 | $368.33 | $28,471,831 |
| August 26, 2021 | 77,300 | $366.94 | $28,364,462 |
| August 27, 2021 | 77,300 | $369.60 | $28,570,389 |
| August 30, 2021 | 6,300 | $376.28 | $2,370,582 |
| August 30, 2021 | 71,000 | $376.14 | $26,706,152 |
| August 31, 2021 | 77,300 | $380.74 | $29,431,202 |
| September 1, 2021 | 77,300 | $381.94 | $29,523,730 |
| September 2, 2021 | 77,300 | $377.69 | $29,195,668 |
| September 3, 2021 | 77,300 | $375.28 | $29,009,221 |
| September 7, 2021 | 77,300 | $378.47 | $29,255,499 |
| September 8, 2021 | 77,300 | $377.96 | $29,216,230 |
| September 9, 2021 | 77,300 | $378.31 | $29,243,363 |

| | | | |
|---|---|---|---|
| September 10, 2021 | 77,300 | $380.96 | $29,447,898 |
| September 13, 2021 | 77,300 | $377.70 | $29,196,519 |
| September 14, 2021 | 77,300 | $377.21 | $29,158,333 |
| September 15, 2021 | 77,300 | $372.59 | $28,801,052 |
| September 16, 2021 | 77,300 | $371.85 | $28,744,159 |
| September 17, 2021 | 77,300 | $366.49 | $28,329,754 |
| September 20, 2021 | 71,000 | $355.46 | $25,237,731 |
| September 20, 2021 | 6,300 | $354.99 | $2,236,437 |
| September 21, 2021 | 77,300 | $357.95 | $27,669,457 |
| September 22, 2021 | 77,300 | $345.12 | $26,677,853 |
| September 23, 2021 | 77,300 | $346.48 | $26,783,135 |
| September 24, 2021 | 6,300 | $348.95 | $2,198,403 |
| September 24, 2021 | 71,000 | $349.22 | $24,794,904 |
| September 27, 2021 | 77,300 | $351.24 | $27,150,542 |
| September 28, 2021 | 77,300 | $344.17 | $26,604,109 |
| September 29, 2021 | 77,300 | $342.21 | $26,452,987 |
| September 30, 2021 | 77,300 | $340.76 | $26,341,134 |
| October 1, 2021 | 77,300 | $342.11 | $26,445,180 |
| October 4, 2021 | 54,504 | $329.35 | $17,951,110 |
| October 4, 2021 | 4,800 | $329.36 | $1,580,913 |
| October 5, 2021 | 77,300 | $331.28 | $25,607,943 |
| October 6, 2021 | 77,300 | $330.51 | $25,548,345 |
| October 7, 2021 | 75,761 | $333.91 | $25,297,128 |
| October 8, 2021 | 77,193 | $331.45 | $25,585,465 |
| October 11, 2021 | 57,750 | $328.16 | $18,951,066 |
| October 13, 2021 | 52,700 | $325.02 | $17,128,817 |
| October 14, 2021 | 52,900 | $328.73 | $17,389,869 |

| October 15, 2021 | 52,700 | $325.89 | $17,174,350 |
| October 18, 2021 | 77,300 | $332.17 | $25,676,431 |
| October 19, 2021 | 77,300 | $339.60 | $26,251,157 |
| October 20, 2021 | 77,300 | $341.67 | $26,411,322 |
| October 21, 2021 | 77,300 | $340.05 | $26,286,019 |

Thus, in total, before the fraud was exposed, he sold 7,318,613 Company shares at artificially inflated prices on inside information, for which he received approximately $2.57 billion. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

28.    The 2021 Proxy Statement described Defendant Zuckerberg's "Skills and Qualifications" as follows:

- Extensive leadership, entrepreneurship, global business, technology, and product innovation and development experience, as well as in-depth knowledge of our company and experience with the dynamics of our industry, through service as our Founder, Chief Executive Officer, and Chairman of our board of directors

**Defendant Wehner**

29.    Defendant Wehner has served as the Company's CFO since June 2014. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Wehner beneficially owned 64,323 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Wehner owned approximately $18.9 million worth of Facebook stock.

30.    For the 2020 Fiscal Year, Defendant Wehner received $16,141,237 in total compensation from the Company. This included $823,846 in salary, $849,592 as a bonus, $14,370,187 in stock awards, and $97,612 in all other compensation. For the 2019 Fiscal Year, Defendant Wehner received $21,334,036 in total compensation from the Company. This included $785,385 in salary, $809,928 as a bonus, $19,678,923 in stock awards, and $59,800 in all other compensation. For the 2018 Fiscal Year, Defendant Wehner received $19,686,113 in total compensation from the Company. This included $753,846 in salary, $499,494 as a bonus, $18,423,523 in stock awards, and $9,250 in all other compensation. For the 2017

Fiscal Year, Defendant Wehner received $22,426,287 in total compensation from the Company. This included $711,539 in salary, $633,317 as a bonus, $21,072,431 in stock awards, and $9,000 in all other compensation. For the 2016 Fiscal Year, Defendant Wehner received $16,544,275 in total compensation from the Company. This included $662,692 in salary, $940,421 as a bonus, $14,931,596 in stock awards, and $9,566 in all other compensation.

31.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wehner made the following sales of Company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| April 29, 2021 | 16,000 | $330.10 | $5,281,600 |
| August 15, 2021 | 1,545 | $363.18 | $561,113 |
| August 18, 2021 | 9,607 | $356.10 | $3,421,052 |

Thus, in total, before the fraud was exposed, he sold 27,152 Company shares at artificially inflated prices on inside information, for which he received approximately $9.3 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.     The 2021 Proxy Statement listed Defendant Wehner's "Experience" as follows:

**Facebook, Inc.**
Chief Financial Officer (2014-present)
Vice President, Corporate Finance and Business Planning (2012-2014)

**Zynga Inc.**
Chief Financial Officer (2010-2012)

**Allen & Company**
Managing Director (2006-2010)
Director (2005-2006)
Various other positions (2001-2005)

**<u>Defendant Clegg</u>**

33.     Defendant Clegg has served as the Company's Vice President of Global Affairs and Communications since October 2018.

**Defendant Alford**

34.     Defendant Alford has served as a Company director since May 2019. She also serves as a member on the Audit & Risk Oversight Committee and the Privacy Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Alford beneficially owned 3,765 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Alford owned approximately $1.1 million worth of Facebook stock.

35.     For the 2020 Fiscal Year, Defendant Alford received $528,053 in total compensation from the Company. This included $125,363 in fees earned or paid in cash and $402,690 in stock awards. For the 2019 Fiscal Year, Defendant Alford received $334,317 in total compensation from the Company. This included $29,444 in fees earned or paid in cash and $304,873 in stock awards.

36.     The 2021 Proxy Statement listed Defendant Alford's "Skills and Qualifications" as follows:

- Global business, leadership, and compliance experience in both operational and financial oversight roles, as well as experience with technology, product development, and the dynamics of our industry, as Executive Vice President, Global Sales at PayPal Holdings, Inc. and through prior service in senior leadership positions at PayPal, eBay Inc., and Rent.com, an eBay company
- Outside board experience as a director of The Macerich Company

**Defendant Andreessen**

37.     Defendant Andreessen has served as a Company director since June 2008. He also serves as a member of the Compensation, Nominating & Governance Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Andreessen beneficially owned 44,434 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Andreessen owned approximately $13.1 million worth of Facebook stock.

38.     For the 2020 Fiscal Year, Defendant Andreessen received $392,245 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $322,245 in stock awards. For the 2019 Fiscal Year, Defendant Andreessen received $374,873 in total compensation from the

Company. This included $70,000 in fees earned or paid in cash and $304,873 in stock awards. For the 2018 Fiscal Year, Defendant Andreessen received $391,194 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $321,194 in stock awards. For the 2017 Fiscal Year, Defendant Andreessen received $369,151 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $299,151 in stock awards. For the 2016 Fiscal Year, Defendant Andreessen received $386,006 in total compensation from the Company. This included $90,000 in fees earned or paid in cash and $296,006 in stock awards.

39. The 2021 Proxy Statement listed Defendant Andreessen's "Skills and Qualifications" as follows:

- Finance and investment expertise, as well as experience with technology and the dynamics of our industry, as co-founder and General Partner of Andreessen Horowitz
- Extensive leadership, business, technology, and entrepreneurship experience through prior service as co-founder and Chairman of the board of directors of Opsware, Inc. (formerly known as Loudcloud Inc.), Chief Technology Officer of America Online, Inc., and co-founder of, and service in senior leadership positions at, Netscape Communications Corporation, including as Chief Technology Officer and Executive Vice President of Products
- Outside board experience as a director of Coinbase Global, Inc. and numerous private companies, as well as prior service as a director of eBay Inc., Hewlett-Packard Company, and Hewlett Packard Enterprise Company

**Defendant Bowles**

40. Defendant Bowles served as a Company director from September 2011 until May 2019.

41. For the 2019 Fiscal Year, Defendant Bowles received $29,167 in total compensation from the Company, consisting entirely of fees earned or paid in cash. For the 2018 Fiscal Year, Defendant Bowles received $421,194 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $321,194 in stock awards. For the 2017 Fiscal Year, Defendant Bowles received $399,151 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $299,151 in stock awards. For the 2016 Fiscal Year, Defendant Bowles received $416,006 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $296,006 in stock awards.

42.     The proxy statement filed on Schedule 14A with the SEC on April 12, 2019 (the "2019 Proxy Statement") said the following about Defendant Bowles:

*Erskine B. Bowles* has served as a member of our board of directors since September 2011. Mr. Bowles is President Emeritus of the University of North Carolina and served as President from January 2006 through December 2010. Mr. Bowles has served as Chairman of the Board of Advisors of BDT Capital Partners, LLC, a private investment firm, since February 2018, and served as a Senior Advisor and non-executive vice chairman from January 2012 to February 2018. From February 2010 until December 2010, he served as Co-Chair of the National Commission on Fiscal Responsibility and Reform. Mr. Bowles was Managing Director of Carousel Capital LLC, a private investment firm, from 1999 to 2001, and was a Senior Advisor for the firm from 2001 to 2015. He was also a partner of Forstmann Little & Co., an investment firm, from 1999 to 2001. Mr. Bowles began his career in corporate finance at Morgan Stanley & Co. LLC and subsequently helped found and ultimately served as Chairman and Chief Executive Officer of Bowles Hollowell Connor & Co., an investment banking firm. He also was a founder of Kitty Hawk Capital, a venture capital firm. Mr. Bowles served as White House Chief of Staff from 1996 to 1998 and Deputy White House Chief of Staff from 1994 to 1995. Mr. Bowles also served as a member of the board of directors of General Motors Company from June 2005 to April 2009, Cousins Properties Incorporated from August 2003 to May 2012, Belk, Inc. from May 2011 to November 2015, Morgan Stanley from December 2005 to February 2018, and Norfolk Southern Corporation from February 2011 to May 2018. Mr. Bowles holds a B.S. in business from the University of North Carolina at Chapel Hill and an M.B.A. from Columbia University Graduate School of Business. Mr. Bowles' term as a member of our board of directors will end at the Annual Meeting, and we thank him for his distinguished service.

**Defendant Desmond-Hellmann**

43.     Defendant Desmond-Hellmann served as a Company director from March 2013 until October 2019.

44.     For the 2019 Fiscal Year, Defendant Desmond-Hellmann received $397,3773 in total compensation from the Company. This included $92,500 in fees earned or paid in cash and $304,873 in stock awards. For the 2018 Fiscal Year, Defendant Desmond-Hellmann received $428,194 in total compensation from the Company. This included $107,000 in fees earned or paid in cash and $321,194 in stock awards. For the 2017 Fiscal Year, Defendant Desmond-Hellmann received $369,151 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $299,151 in stock awards. For the 2016 Fiscal Year, Defendant Desmond-Hellmann received $386,006 in total

compensation from the Company. This included $90,000 in fees earned or paid in cash and $296,006 in stock awards.

45.     The 2019 Proxy Statement stated the following regarding Defendant Desmond-Hellmann:

*Susan D. Desmond-Hellmann* has served as a member of our board of directors since March 2013 and as our Lead Independent Director since June 2015. Dr. Desmond-Hellmann has served as the Chief Executive Officer of the Bill & Melinda Gates Foundation since May 2014. Prior to the Bill & Melinda Gates Foundation, Dr. Desmond-Hellmann was the Chancellor at University of California, San Francisco (UCSF) from August 2009 to May 2014. From 2004 through 2009, Dr. Desmond-Hellmann served as President of Product Development at Genentech, where she was responsible for pre-clinical and clinical development, business development, and product portfolio management. She joined Genentech in 1995. Prior to joining Genentech, Dr. Desmond-Hellmann was associate director of clinical cancer research at Bristol-Myers Squibb Pharmaceutical Research Institute. In addition to serving on our board of directors, Dr. Desmond-Hellmann previously served as a member of the board of directors of The Procter & Gamble Company from December 2010 until October 2016. Dr. Desmond-Hellmann holds a B.S. in pre-med and an M.D. from the University of Nevada, Reno, and an M.P.H. from the University of California, Berkeley. We believe Dr. Desmond-Hellmann should serve as a member of our board of directors due to her extensive leadership and global business experience, as well as her experience with product innovation and development and her contributions to social causes through her work at the Bill & Melinda Gates Foundation.

**Defendant Hastings**

46.     Defendant Hastings served as a Company director from June 2011 until May 2019.

47.     For the 2019 Fiscal Year, Defendant Hastings received $20,833 in total compensation from the Company, consisting entirely of fees earned or paid in cash. For the 2018 Fiscal Year, Defendant Hastings received $371,194 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $321,194 in stock awards. For the 2017 Fiscal Year, Defendant Hastings received $349,151 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $299,151 in stock awards. For the 2016 Fiscal Year, Defendant Hastings received $346,006 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $296,006 in stock awards.

48.     The 2019 Proxy Statement stated the following regarding Defendant Hastings:

*Reed Hastings* has served as a member of our board of directors since June 2011. Mr. Hastings has served as the Chief Executive Officer and Chairman of the board of directors of Netflix, Inc., a provider of an Internet subscription service for movies and television

shows, since 1999. Prior to Netflix, Mr. Hastings served as Chief Executive Officer of Technology Network, a political service organization for the technology industry. Mr. Hastings served as Chief Executive Officer of Pure Atria Software, a maker of software development tools, from 1991 until it was acquired by Rational Software Corporation in 1997. Mr. Hastings previously served as a member of the board of directors of Microsoft Corporation from March 2007 to November 2012. Mr. Hastings holds a B.A. in mathematics from Bowdoin College and an M.S.C.S. in computer science from Stanford University. Mr. Hastings' term as a member of our board of directors will end at the Annual Meeting, and we thank him for his distinguished service.

### Defendant Houston

49.      Defendant Houston has served as a Company director since February 2020. He also serves as a member of the Compensation, Nominating & Governance Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Houston beneficially owned 3,565 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Houston owned approximately $1.0 million worth of Facebook stock.

50.      For the 2020 Fiscal Year, Defendant Houston received $1,646,537 in total compensation from the Company. This included $85,467 in fees earned or paid in cash and $1,561,070 in stock awards.

51.      The 2021 Proxy Statement listed Defendant Houston's "Skills and Qualifications" as follows:

- Extensive leadership, entrepreneurship, business, technology, and product innovation and development experience, as well as experience with the dynamics of our industry, as Chief Executive Officer of Dropbox, Inc.
- Outside board experience as Chairman of the board of directors of Dropbox

### Defendant Killefer

52.      Defendant Killefer has served as a Company director since March 2020. She also serves as Chair of the Privacy Committee and a member of the Audit & Risk Oversight Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Killefer beneficially owned 3,207 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Killefer owned approximately $945,000 worth of Facebook stock.

53.     For the 2020 Fiscal Year, Defendant Killefer received $1,663,290 in total compensation from the Company. This included $100,527 in fees earned or paid in cash and $1,562,763 in stock awards.

54.     The 2021 Proxy Statement listed Defendant Killefer's "Skills and Qualifications" as follows:

- Extensive leadership, business, and compliance experience through prior service as Senior Partner and in other leadership roles at McKinsey & Company, an international management consulting firm, including as a member of the firm's governing board
- Prior service in senior U.S. government roles, including as Assistant Secretary for Management, Chief Financial Officer, and Chief Operating Officer of the U.S. Department of the Treasury and as Chair of the IRS Oversight Board
- Outside board experience as a director of Cardinal Health, Inc. and Natura & Company, as well as prior service as a director of the Advisory Board Company, Avon Products, Inc., Computer Sciences Corporation, CSRA, Inc., and Taubman Centers, Inc.

**Defendant Kimmitt**

55.     Defendant Kimmitt has served as a Company director since March 2020. He also serves as Lead Independent Director and a member of the Privacy Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Kimmitt beneficially owned 3,140 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Kimmitt owned approximately $925,000 worth of Facebook stock.

56.     For the 2020 Fiscal Year, Defendant Kimmitt received $1,749,309 in total compensation from the Company. This included $190,044 in fees earned or paid in cash and $1,559,265 in stock awards.

57.     The 2021 Proxy Statement listed Defendant Kimmitt's "Skills and Qualifications" as follows:

- Legal and compliance experience as Senior International Counsel at Wilmer Cutler Pickering Hale and Dorr LLP, and prior service as partner at Wilmer Cutler & Pickering and Sidley & Austin LLP
- Prior service in senior U.S. government roles, including experience with privacy issues, as Deputy Secretary of the Treasury, United States Ambassador to Germany, Under Secretary of State for Political Affairs, General Counsel for the U.S. Department of the Treasury, and National Security Council Executive Secretary and General Counsel

- Global business, leadership, policy, and finance experience, including through prior service as Executive Vice President of Global Public Policy at Time Warner Inc., Vice Chairman and President of Commerce One, and managing director at Lehman Brothers
- Outside board experience through prior service as a director of Deutsche Lufthansa AG, Commerce One, Inc., Siemens AG, United Defense Industries, Inc., and Big Flower Press Holdings, Inc.

**Defendant Sandberg**

58.     Defendant Sandberg has served as the Company's Chief Operating Officer ("COO") since March 2008 and as a member of the Board since June 2012. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Sandberg beneficially owned 1,379,179 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Sandberg owned approximately $406 million worth of Facebook stock.

59.     For the 2020 Fiscal Year, Defendant Sandberg received $24,754,004 in total compensation from the Company. This included $918,077 in salary, $946,767 as a bonus, $14,370,187 in stock awards, and $8,518,973 in all other compensation, consisting of the cost of private security and her personal use of private aircraft. For the 2019 Fiscal Year, Defendant Sandberg received $27,144,147 in total compensation from the Company. This included $875,385 in salary, $902,740 as a bonus, $19,678,923 in stock awards, and $5,697,099 in all other compensation, consisting of the cost of private security and her personal use of private aircraft. For the 2018 Fiscal Year, Defendant Sandberg received $23,728,148 in total compensation from the Company. This included $843,077 in salary, $638,310 as a bonus, $18,423,523 in stock awards, and $3,823,508 in all other compensation. For the 2017 Fiscal Year, Defendant Sandberg received $25,196,221 in total compensation from the Company. This included $795,769 in salary, $640,378 as a bonus, $21,072,431 in stock awards, and $2,687,643 in all other compensation, consisting of the cost of private security. For the 2016 Fiscal Year, Defendant Sandberg received $24,549,457 in total compensation from the Company. This included $738,077 in salary, $1,293,635 as a bonus, $19,908,426 in stock awards, and $2,609,319 in all other compensation.

60.     The 2021 Proxy Statement listed Defendant Sandberg's "Skills and Qualifications" as follows:

- Extensive leadership, global business, technology, and product development experience, as well as in-depth knowledge of our company and experience with the dynamics of our industry, through service as our Chief Operating Officer
- Global business, leadership, and finance experience through prior service as Vice President, Global Online Sales & Operations at Google, Inc., a consultant with McKinsey & Company, and an economist with The World Bank
- Prior service in U.S. government as a Chief of Staff of the U.S. Department of the Treasury and Senior Advisor to the Deputy Secretary of the Treasury
- Outside board experience as a director of SurveyMonkey (SVMK Inc.) and prior service as a director of Starbucks Corporation and the Walt Disney Company

**Defendant Thiel**

61.     Defendant Thiel has served as a Company director since April 2005. He also serves as Chair of the Compensation, Nominating & Governance Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Thiel beneficially owned 12,947 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Thiel owned approximately $3.8 million worth of Facebook stock.

62.     For the 2020 Fiscal Year, Defendant Thiel received $372,245 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $322,245 in stock awards. For the 2019 Fiscal Year, Defendant Thiel received $354,873 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $304,873 in stock awards. For the 2018 Fiscal Year, Defendant Thiel received $371,194 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $321,194 in stock awards. For the 2017 Fiscal Year, Defendant Thiel received $349,151 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $299,151 in stock awards. For the 2016 Fiscal Year, Defendant Thiel received $346,006 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $296,006 in stock awards.

63.     The 2021 Proxy Statement listed Defendant Thiel's "Skills and Qualifications" as follows:

- Finance and investment expertise, as well as experience with technology and the dynamics of our industry, as President of Thiel Capital and Partner of Founders Fund

- Extensive leadership, business, technology, entrepreneurship, and product innovation experience as co-founder of Palantir Technologies Inc. and through prior service as co-founder, Chief Executive Officer, and President of PayPal, Inc.
- Outside board experience as Chairman of the board of directors of Palantir, a director of AbCellera Biologics Inc. and several private companies, and prior service as Chairman of the board of directors of PayPal

**Defendant Travis**

64.     Defendant Travis has served as a Company director since March 2020. She also serves as Chair of the Audit & Risk Oversight Committee. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Travis beneficially owned 3,207 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $294.53, Defendant Travis owned approximately $945,000 worth of Facebook stock.

65.     For the 2020 Fiscal Year, Defendant Travis received $1,677,488 in total compensation from the Company. This included $114,725 in fees earned or paid in cash and $1,562,763 in stock awards.

66.     The 2021 Proxy Statement listed Defendant Travis's "Skills and Qualifications" as follows:

- Global business and extensive financial experience as Executive Vice President and Chief Financial Officer of The Estée Lauder Companies Inc., as well as prior service as Senior Vice President and Chief Financial Officer of Ralph Lauren Corporation and in senior finance leadership positions at Limited Brands, Intimate Brands Inc., and Americas Group of American National Can Group, Inc.
- Outside board experience as a director of Accenture plc, as well as prior service as a director of Campbell Soup Company

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

67.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Facebook and because of their ability to control the business and corporate affairs of Facebook, the Individual Defendants owed Facebook and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Facebook in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Facebook and its shareholders so as to benefit all shareholders equally.

68.     Each controlling shareholder, director, and officer of the Company owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Facebook, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the controlling shareholder, officers, and directors of Facebook were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Facebook, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Facebook's Board at all relevant times.

72.     As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73.     To discharge their duties, the controlling shareholder, officers, and directors of Facebook were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Facebook were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Facebook's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Facebook conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as the Platform Content Misconduct, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Facebook and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Facebook's operations would comply with all applicable laws and Facebook's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to Facebook and the shareholders the duty of loyalty requiring that each favor Facebook's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Facebook and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, and directorial positions with Facebook, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Facebook.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Facebook was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Facebook and was at all times acting within the course and scope of such agency.

## FACEBOOK'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Code of Conduct

83.     The Introduction to Facebook's Code of Conduct reads: "Our reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone."

84.     Among the "Five principles" that "guide [the] work at Facebook" is number four: "Keep people safe and protect privacy—we are committed to protecting communities from harm."

85.     The Code of Conduct defined "Facebook Personnel" to encompass "[m]embers of the Board of Directors, officers, and employees of Facebook, as well as contingent workers" and notes that "[a]ll Facebook Personnel are required to" "[a]ct in accordance with Facebook principles and follow the requirements of this Code and Company policies" as well as to "[a]ct lawfully, honestly, ethically and in the best interests of Facebook and our Facebook users at all times."

86.     Moreover, "those who lead or manage Facebook Personnel are required to" "[p]romptly report potential or known violations of the law, this Code, or Company Polices to Legal."

87.     Regarding conflicts of interest, the Code of Conduct provides that:

All of us have personal interests that make us unique and allow us to bring value to Facebook. Even so, we put Facebook first when we come to work or represent Facebook. We must always use our best judgment and avoid situations where our personal interests and relationships might interfere or appear to interfere with the best interests of Facebook.

88.     Specifically concerning the use of people's data, the Code of Conduct provides that Facebook Personnel "[p]roperly respond to events that undermine the confidentiality, integrity, or availability of data for which Facebook is responsible."

89.     Moreover, the Code of Conduct charges Facebook Personnel to "Innovate responsibly" which includes "making every effort to anticipate and mitigate potential harms in all that we build." The Code of Conduct continues that to innovate responsibly means to:

- Consider a broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others

- Raise and address potential harms early and often throughout the product development process

- Seek out expert voices, diverse perspectives and the resources and tools we have at Facebook to inform our decisions

- Engage in necessary reviews, such as Privacy Review and Integrity XFN review

- Design and build products that prioritize safety and privacy

- Work quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation, threats of violence and terrorism

- Use and access internal tools with care and caution, only as necessary to do our job and never for personal gain or to assist a user in avoiding detection or penalty — Facebook has a zero tolerance for inappropriate use or access of internal tools

- Design and build products that prioritize safety, privacy, provide appropriate warnings where necessary and articulate instructions for safe and responsible use

90.     Regarding recordkeeping, the Code of Conduct states that: "We create and maintain accurate financial and business records, so that we and others in the market can rely on trusted and timely information about Facebook's performance and impact." Moreover, the Code of Conduct instructs

Facebook Personnel to "[r]ecord maintain and file financial transactions and business records truthfully, accurately, on time and with the appropriate detail, including supporting documentation[.]"

91.     In a section titled, "Do not engage in insider trading," the Code of Conduct provides: "We do not use or share material non-public information about Facebook or other companies for trading purposes because doing so is illegal and would harm Facebook's relationships with investors, regulators and the public." The Code of Conduct further instructs: "Never trade stock in Facebook or another public company while in possession of material non-public information concerning such stock"

92.     Under another section of the Code of Conduct, titled "Communicate openly and transparently," the Code of Conduct provides that: "Communicating openly and transparently means we . . . [a]re clear, truthful, transparent, courteous and professional in our internal and external communications."

### Audit Committee Charter

93.     The Charter of the Audit & Risk Oversight Committee of the Board of Directors of Meta Platforms, Inc. (the "Audit Committee Charter") defines the responsibilities of the Company's Audit & Risk Oversight Committee.

94.     Regarding the Audit & Risk Oversight Committee's responsibilities surrounding "Financial Statements and Disclosures," the Audit Committee Charter provides:

a. The Committee will meet to review and discuss with the independent auditor and the Company's management the Company's quarterly financial statements and annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*          *          *

d. The Committee will discuss with the independent auditors and the Company's management any items appropriate or required to be discussed in accordance with applicable PCAOB standards in connection with the preparation of financial statements of the Company.

95.     Moreover, the Audit Committee Charter provides that the "Committee will be responsible for oversight of significant financial matters, including . . . share repurchase activities[.]"

96.     In addition, the Audit Committee Charter provides that the Audit & Risk Oversight

Committee "shall assist the Board in overseeing the risk management of the Company and shall oversee certain of the Company's major risk exposures" including:

1. *Financial and Enterprise Risk.* The Committee will review with management, at least annually, the Company's major financial risk and enterprise exposures and the steps management has taken to monitor or mitigate such exposures.

2. *Legal and Regulatory Compliance.* The Committee will review with management, at least annually, (a) the Company's program for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) the Company's major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

*          *          *

4. *Social Responsibility.* The Committee will review with management (a) at least annually, the Company's assessment of the major ways in which its services can be used to facilitate harm or undermine public safety or the public interest, including through the sharing of content on its services that violate the Company's policies, as well as the steps the Company has taken to monitor, mitigate, and prevent such abuse, and (b) from time to time, such other program, policies, and risk exposures related to social responsibility as the Committee deems necessary or appropriate.

5. *Cybersecurity.* The Committee will review with management, at least annually, the Company's cybersecurity risk exposures and the steps the Company has taken to monitor or mitigate such exposures.

6. *Other Risk Oversight.* The Committee will periodically review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time. The Privacy Committee of the Board shall oversee risk exposures related to privacy and data use.

97.     The Audit Committee Charter also provides that:

The Committee will review and discuss with the independent auditor and the Company's management their periodic reviews of the Company's accounting and financial reporting processes, systems of internal control (including any significant deficiencies and material weaknesses identified in their design or operation), disclosure controls and procedures (and management's reports thereon) and any fraud involving management or other employees with a significant role in internal control over financial reporting.

98.     Finally, the Audit Committee Charter provides that the Audit & Risk Oversight Committee "will periodically review with the Company's management the status of any legal or regulatory matters that could have a significant impact on the Company's financial statements."

99.     The Individual Defendants violated Facebook's Code of Conduct by engaging in or permitting the scheme to cause the Company to engage in the Platform Content Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act lawfully, honestly, ethically and in the best interests of Facebook, failing to promptly report known violations of the Code of Conduct and the law, failing to properly respond to events that undermine the confidentiality, integrity, or availability of data for which Facebook is responsible, failing to design and build products that prioritize safety and privacy, failing to create accurate records, and failing to communicate honestly and transparently. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading.

100.    Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to engage in the Platform Content Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately review and discuss with management the Company's SEC filings, causing or permitting the Company to repurchase approximately 71,270,000 shares of the Company's common stock at artificially inflated prices, and failing to adequately exercise their risk management function including without limitation their responsibility to assess "the major ways in which [Facebook's] services can be used to facilitate harm or undermine public safety or the public interest, including through the sharing of content on its services that violate the Company's policies, as well as the steps the Company has taken to monitor, mitigate, and prevent such abuse[.]"

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

101.     Facebook is Delaware corporation based in California. Facebook's products include one of the world's most heavily used social media platforms, the eponymous Facebook, as well as Instagram, an app for sharing photos, and Facebook Messenger and WhatsApp, apps for sending messages between users.

102.     Facebook primarily generates revenue by selling digital advertisement placements to those interested in advertising to the users of Facebook's products. Moreover, Facebook collects data about its users which is of interest to advertisers and gives advertisers the ability to more specifically target demographics of their choosing based on this user data. Facebook also uses this data to push content to users, which content Facebook's algorithms have determined would be of interest to these users.

103.     During the Relevant Period, the Individual Defendants caused Facebook to publicly represent that it went to great lengths to adequately moderate content, ensuring the prompt removal of illegal and harmful content, as well as any other content that was contrary to Facebook's policies. Facebook further represented its commitment to keeping users safe and to apply its content policies uniformly across its multifaceted user base. Moreover, Facebook publicly reported on its user metrics, and represented that in the United States and other "developed markets" the incidence of fake and duplicate accounts, which could inflate user metrics, were low.

### False and Misleading Statements

#### November 3, 2016 Form 10-Q

104.     On November 3 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendant Wehner and contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Zuckerberg and Wehner, attesting to the accuracy of the financial statements contained in the 3Q16 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

105.    The 3Q16 10-Q represented that the number Facebook's monthly active users ("MAUs") in the United States and Canada grew from 199 million to 229 million from September 30, 2013 to September 30, 2016. In addition, the 3Q16 10-Q represented that the number of MAUs in Europe grew from 276 million to 342 million from September 30, 2013 to September 30, 2016.

106.    In addition, the 3Q16 10-Q stated that the Company "believe[s] *the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom* and higher in developing markets such as India and Turkey." (Emphasis added.)

### February 2, 2017 Form 10-K

107.    On February 2, 2017, Facebook filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 2016 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

108.    The 2016 10-K represented that the number Facebook's MAUs in the United States and Canada grew from 201 million to 231 million from December 31, 2013 to December 31, 2016. In addition, the 2016 10-K represented that the number of MAUs in Europe grew from 282 million to 349 million from December 31, 2013 to December 31, 2016.

109.    The 2016 10-K repeated the claim that the Company "believe[s] *the percentage of accounts that are duplicate or false is meaningfully lower in developed markets such as the United States or United Kingdom* and higher in developing markets such as India and Turkey." (Emphasis added.)

### February 1, 2018 Form 10-K

110.    On February 1, 2018, Facebook filed its annual report for the fiscal year ended December 31, 2017 on Form 10-K with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel and

contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 2017 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

111.    The 2017 10-K represented that the number Facebook's MAUs in the United States and Canada grew from 231 million to 239 million from December 31, 2016 to December 31, 2017. In addition, the 2017 10-K represented that the number of MAUs in Europe grew from 349 million to 370 million from December 31, 2016 to December 31, 2017.

112.    The 2017 10-K repeated the claim that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as India, Indonesia, and the Philippines, *as compared to more developed markets.*" (Emphasis added.)

### *July 2018 Statement*

113.    On July 16, 2018, the Company issued a statement via its website entitled, "Working to Keep Facebook Safe." The statement read, in relevant part:

> *It has been suggested that turning a blind eye to bad content is in our commercial interests. This is not true.* Creating a safe environment where people from all over the world can share and connect is core to Facebook's long-term success.

> *                *                *

> **How We Create and Enforce Our Policies**

> More than 1.4 billion people use Facebook every day from all around the world. They post in dozens of different languages: everything from photos and status updates to live videos. Deciding what stays up and what comes down involves hard judgment calls on complex issues — from bullying and hate speech to terrorism and war crimes. *It's why we developed our Community Standards with input from outside experts* — including academics, NGOs and lawyers from around the world. We hosted three Facebook Forums in Europe in May, where we were able to hear from human rights and free speech advocates, as well as counter-terrorism and child safety experts.

> These Community Standards have been publicly available for many years, and this year, for the first time, *we published the more detailed internal guidelines used by our review teams to enforce them.*

> *                *                *

Reviewing reports quickly and accurately is essential to keeping people safe on Facebook. This is why we're doubling the number of people working on our safety and security teams this year to 20,000. This includes over 7,500 content reviewers. ***We're also investing heavily in new technology to help deal with problematic content on Facebook more effectively. For example, we now use technology to assist in sending reports to reviewers with the right expertise, to cut out duplicate reports, and to help detect and remove terrorist propaganda and child sexual abuse images before they've even been reported.***

(Italicized emphasis added.)

114.    The next day, July 17, 2018, the Company updated this statement, adding the following language, in relevant part:

**Cross Check**
***We want to make clear that we remove content from Facebook, no matter who posts it, when it violates our standards. There are no special protections for any group — whether on the right or the left. 'Cross Check' — the system described in Dispatches — simply means that some content from certain Pages or Profiles is given a second layer of review to make sure we've applied our policies correctly.***

***This typically applies to high profile, regularly visited Pages or pieces of content on Facebook so that they are not mistakenly removed or left up.*** Many media organizations' Pages — from Channel 4 to The BBC and The Verge — are cross checked. We may also Cross Check reports on content posted by celebrities, governments, or Pages where we have made mistakes in the past. For example, we have Cross Checked an American civil rights activist's account to avoid mistakenly deleting instances of him raising awareness of hate speech he was encountering.

***To be clear, Cross Checking something on Facebook does not protect the profile, Page or content from being removed. It is simply done to make sure our decision is correct.***

*          *          *

**Minors**
***We do not allow people under 13 to have a Facebook account.*** If someone is [sic] reported to us as being under 13, the reviewer will look at the content on their profile (text and photos) to try to ascertain their age. If they believe the person is under 13, the account will be put on a hold and the person will not be able to use Facebook until they provide proof of their age. Since the program, we have been working to update the guidance for reviewers to put a hold on any account they encounter if they have a strong indication it is underage, even if the report was for something else.

(Italicized emphasis added.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*January 31, 2019 Form 10-K*

115.     On January 31, 2019, Facebook filed its annual report for the fiscal year ended December 31, 2018 on Form 10-K with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Zuckerberg, Wehner, Andreessen, Bowles, Desmond-Hellmann, Hastings, Sandberg, and Thiel and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 2018 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116.     The 2018 10-K represented that the number Facebook's MAUs in the United States and Canada grew from 239 million to 242 million from December 31, 2017 to December 31, 2018. In addition, the 2018 10-K represented that the number of MAUs in Europe grew from 370 million to 381 million from December 31, 2017 to December 31, 2018.

117.     The 2018 10-K repeated the claim that the Company "believe[s] ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***" (Emphasis added.)

118.     The statements identified in ¶¶ 104–17 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; (3) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

*April 12, 2019 Proxy Statement*

119.    On April 12, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

120.    The 2019 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board; (2) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019; (3) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Zuckerberg, Wehner, and Sandberg; (4) choose, in a non-binding vote, whether future non-binding advisory votes on executive compensation should occur every one, two, or three years (with the Board supporting three years); and (5) to consider eight shareholder proposals, each of which sought to implement certain corporate governance reforms and was opposed by the Company, including one proposal to require Facebook to "publish a report . . . *evaluating its strategies and policies on content governance, including the extent to which they address human rights abuses and threats to democracy and freedom of expression, and the reputational, regulatory, and financial risks posed by content governance controversies*." (Emphasis added.)

121.    The 2019 Proxy Statement stated the following regarding the performance-based portion of named executive officer compensation:

*2018 Priorities and Company Performance Percentage.* **Our First Half 2018 and Second Half 2018 company priorities as approved by the compensation & governance committee were as follows: grow our user base across all our products**; increase sharing, engagement, and meaningful interactions; continue to achieve revenue growth and significant savings from efficiency; improve product quality; **improve security for our community; improve our brand**; and make progress toward our long-term investments. **None of these priorities were assigned any specific weighting or dollar amount of the target bonus. The compensation & governance committee exercised its discretion in determining the company performance percentage** for our First Half 2018 and Second Half 2018 performance after taking into account our delivery of results in the areas identified by the company priorities, as well as our overall business, engineering, and product development achievements.

*The First Half 2018 company performance* percentage approved by the compensation & governance committee *was 90%. In making this determination, the compensation & governance committee focused on* our performance across all of the areas identified by the company priorities, with a particular focus on *user growth and engagement*, revenue growth, and brand in the First Half 2018, *and also noted our significant investments in safety and security for our community.*

(Emphasis added.)

122.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated that Facebook's "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." Moreover, the 2019 Proxy Statement represented that the Company would "satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

123.    Regarding the "Board Role in Risk Oversight," the 2019 Proxy statement said:

Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including in the areas of financial and enterprise risk, legal and regulatory compliance, privacy and data use, community safety and security, and cybersecurity, as well as risks in other areas as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas in its discretion. In addition, our audit & risk oversight committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in "Executive Compensation— Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for certain key executives other than the CEO. The audit & risk

oversight committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

124.    In addition, in opposition to the shareholder proposal, described above, calling for a "Content Governance Report," the 2019 Proxy Statement said:

We believe that implementing *the proposal is unnecessary because our current disclosures provide transparency and detail regarding both our policies around content governance and our progress on enforcing those policies.*

*Our Community Standards help us prevent real world harm and ensure that people feel safe in our community.* We publicize these standards to help people understand our policies and what type of content is allowed on Facebook (*https://www.facebook.com/communitystandards*). In April 2018, for the first time, we published our internal guidelines that our teams use to enforce our Community Standards (*https://newsroom.fb.com/news/2018/04/comprehensive-community-standards*). In November 2018, our Chairman and CEO, Mark Zuckerberg, published an in-depth note on content governance and enforcement (*https://www.facebook.com/notes/mark-zuckerberg/a-blueprint-for-content-governance-and-enforcement/10156443129621634*).

In May 2018, we released our first-ever Community Standards Enforcement Report to track our progress on enforcing our content policies. In this twice-annual report, we disclose the prevalence of violating content, the amount of content we take action on, and the amount of content we find proactively before people report it (*https://transparency.facebook.com/community-standards-enforcement*). For example, in November 2018, we disclosed that we removed more than 1.2 billion pieces of content for violating our spam policies in the third quarter of 2018. We also disclosed that 99% of terrorist content that we remove, and 96% of the content we remove for nudity, is identified by our systems before anyone reports it. Our broader Transparency Report also includes information on intellectual property infringement, legal and government requests for account data, and internet disruptions (*https://transparency.facebook.com*). We plan to hold conference calls with media after we issue each such report and, by 2020, we expect to publish our enforcement reports quarterly.

We communicate updates and improvements to our Community Standards in our Newsroom, and in 2017, we launched our Hard Questions blog to further enhance transparency and provide detail on how we address complex issues facing our platform (*https://newsroom.fb.com/news/category/hard-questions*). Past posts have covered terrorism, hate speech, and our content review process. We continue to invite questions on topics we should address via hardquestions@fb.com.

*We also regularly disclose risks and developments relating to content management matters* in our financial reporting and filings with the SEC, including in the "Risk Factors" section of our quarterly and annual reports filed with the SEC.

In addition, our stockholders rejected a substantially similar proposal at our annual meeting of stockholders in 2018.

*Given the breadth of our previous disclosures concerning our content policies, and our intent to continue to provide transparency around our policies*, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our stockholders. Therefore, our board of directors recommends that our stockholders vote against this proposal.

(Emphasis added.)

125. Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel caused the 2019 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 121–23 by failing to disclose that: (1) though the Company claimed to consider growth to its user base and improvement and improvements to safety and security for its users in determining the performance-based elements of executive pay, this claim was untrue given that large performance-based awards were granted despite the occurrence of the Platform Content Misconduct and numerous duplicate and fake accounts inflating MAU growth; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board's, and its committees', risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

126. In addition, the 2019 Proxy Statement was materially false and misleading, with regard to the statement in ¶ 124, and failed to disclose material facts necessary to make the statement made not false and misleading, because the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; and (3) the Company failed to maintain internal controls to effect adequate disclosure of the foregoing.

127. As a result of Defendants Zuckerberg, Sandberg, Andreessen, Bowles, Desmond-Hellman, Hastings, and Thiel causing the 2019 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board, allowing them to continue or being breaching their fiduciary duties

to the Company; (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Zuckerberg, Wehner, and Sandberg who were breaching their fiduciary duties to the Company; (3) choose, in a non-binding vote, that future non-binding advisory votes on executive compensation should occur every three years, reducing shareholder's ability to tangibly voice their concerns regarding management who were then breaching their fiduciary duties to the Company; and (4) to reject eight shareholder proposals, including one proposal to require Facebook to publish a "Content Governance Report" which would have required the Company to discuss the issues that lay at the heart of the Platform Content Misconduct. Instead, due to the false and misleading elements of the 2019 Proxy Statement, the Platform Content Misconduct remained unaddressed and undisclosed until Frances Haugen eventually came forward.

### *January 30, 2020 Form 10-K*

128.    On January 30, 2020, Facebook filed its annual report for the fiscal year ended December 31, 2019 on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Zuckerberg, Wehner, Alford, Andreessen, Sandberg, and Thiel and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 2019 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

129.    The 2019 10-K represented that the number Facebook's MAUs in the United States and Canada grew from 242 million to 248 million from December 31, 2018 to December 31, 2019. In addition, the 2019 10-K represented that the number of MAUs in Europe grew from 381 million to 394 million from December 31, 2018 to December 31, 2019.

130.    The 2019 10-K repeated the claim that the Company "believe[s] ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***" (Emphasis added.)

131.    The statements identified in ¶¶ 128–130 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company

was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (2) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

### April 10, 2020 Proxy Statement

132.    On April 10, 2020, the Company filed a proxy statement on Schedule 14A ("2020 Proxy Statement") with the SEC. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

133.    The 2020 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2020; (3) approve a director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (4) to consider eight shareholder proposals, each of which sought to implement certain corporate governance reforms and was opposed by the Company, including (i) a proposal to require Facebook to add a "human/civil rights" expert to the Board by shareholders who "believe Facebook requires expert, board level oversight of civil and human rights issues to assess risk and develop strategy to avoid causing or contributing to widespread violations of human or civil rights;" (ii) a proposal requiring Facebook to publish a civil and humans right risk report given that "[t]argeted advertising associated with civil and human rights violations presents financial, legal and reputational risk" and that "Facebook paid $5 million to settle civil rights lawsuits claiming Facebook's advertising systems excluded people from seeing housing, employment and credit ads based on age, gender and race," and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platforms given that though "Facebook has hired content moderators, has some policies and partnerships, and has implemented some practices and investments in technology to tackle child sex exploitation through its businesses . . . such activities have not significantly reduced the volume of CSAM or children being sexually exploited."

134.    The 2020 Proxy Statement listed the following factors, under "*2019 Priorities and Company Performance Percentage,*" applicable to first half and second half 2019 executive performance-based compensation:

- ***continue making progress on the major social issues*** facing the Internet and our company
- ***build new experiences that meaningfully improve people's lives*** today and set the stage for even bigger improvements in the future;
- keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and
- ***communicate more transparently*** about what we're doing and the role our services play in the world.

(Emphasis added.) The Compensation, Nominating & Governance Committee approved a company performance percentage of ***110%*** based on these factors, notwithstanding the Platform Content Misconduct.

135.    With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated that Facebook's "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." Moreover, the 2020 Proxy Statement represented that the Company would "satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

136.    Regarding the "Board Role in Risk Oversight," the 2020 Proxy Statement said:
Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including in the areas of financial and enterprise risk, legal and regulatory compliance, privacy and data use, community safety and security, and cybersecurity, as well as risks in other areas

as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas or delegate such oversight to committees in its discretion. For example, the special committee of the board formed in connection with our negotiations with the FTC assisted in oversight of the implementation of the requirements of the consent order we entered into with the FTC, including the oversight of certain risks related to privacy and data use. In addition, our audit & risk oversight committee oversees our internal audit function. Our compensation, nominating & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in the section of this proxy statement entitled "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for certain key executives other than the CEO. Each of these committees provide reports to the full board of directors regarding these and other matters.

137.   In addition, in opposition to the shareholder proposal, described above, calling for a civil/human rights expert to be added to the Board, the 2020 Proxy Statement said: "In September 2019, *we expanded the values that serve as the basis for Facebook's Community Standards to focus on authenticity, safety, privacy, and dignity*. *Our Community Standards are built around our commitment to voice and free expression*, and we look to international human rights standards when making judgments about content on our platform." Moreover, this section continued that:

> *In addition, in 2019, we created and institutionalized a Civil Rights Task Force. The Task Force meets monthly for the purpose of surfacing, discussing, and addressing civil rights issues.* Its membership includes senior leaders at Facebook who are issue experts in areas such as content policy, fairness in artificial intelligence, and elections, along with C-suite and other key executives at Facebook. *We are working to onboard strong civil rights expertise to support the work of the Task Force across a range of issues, and to support our company's ongoing civil rights engagement.*

(Emphasis added.)

138.   In opposition to the shareholder proposal, described above, calling for the Company to issue civil/human rights report, the 2020 Proxy Statement said: "We believe that implementing this proposal is unnecessary because *we have policies and practices addressing civil and human rights risks and issues impacting Facebook's community of global users and made significant progress over the last year on our path forward* around human rights and civil rights leadership."

139.   In opposition to the shareholder proposal, described above, calling for the Company to issue a report on child exploitation, the 2020 Proxy Statement said:

*We fundamentally do not allow content or behavior on our services that puts the safety of children at risk.* Our Community Standards ban child exploitation and to help avoid even the potential for abuse, we take action on certain kinds of nonsexual child nudity content, as well. *We have industry-leading efforts in a number of areas to address these issues.*

For years we have been tackling the issue of child exploitative imagery with advanced technologies, industry collaboration through the Technology Coalition, and partnerships with child safety NGOs like the National Center for Missing and Exploited Children (NCMEC), Thorn, the Internet Watch Foundation (IWF), Child Helpline International, ECPAT International, and others. Our work with external experts, including *the Facebook Safety Advisory Board, which is comprised of independent online safety organizations and experts from around the world, continually informs and improves our policies and enforcement around online safety issues*, especially with regards to children.

*                *                *

*Given our existing approach to addressing child exploitation, including our proactive detection of harmful content and accounts, our partnerships with law enforcement and NGOs, and our historical and ongoing transparency on this topic, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our stockholders.* Therefore, our board of directors recommends that our stockholders vote against this proposal.

(Emphasis added.)

140.    Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis caused the 2020 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 134–36 by failing to disclose that: (1) though the Company claimed to consider efforts to make progress on the major social issues facing the Company, efforts to build new experiences that meaningfully improve people's lives, and efforts to communicate more transparently with the public in determining the performance-based elements of executive pay, this claim was untrue given that large performance-based awards were granted despite the occurrence of the Platform Content Misconduct; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board's, and its committees', risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

141.    In addition, the 2020 Proxy Statement was materially false and misleading, with regard to the statements in ¶¶ 137–39, and failed to disclose material facts necessary to make the statements made not false and misleading, because the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; and (3) the Company failed to maintain internal controls to effect adequate disclosure of the foregoing.

142.    As a result of Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis causing the 2020 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) approve a director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis, each of whom was breaching their fiduciary duties to the Company; and (3) reject eight shareholder proposals, including (i) a proposal to require Facebook to add a "human/civil rights" expert to the Board; (ii) a proposal requiring Facebook to publish a civil and humans right risk report; and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platforms. The issues addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct, but, due to the false and misleading elements of the 2020 Proxy Statement, remained unaddressed and undisclosed until Frances Haugen eventually came forward.

### *January 28, 2021 Form 10-K*

143.    On January 28, 2021, Facebook filed its annual report for the fiscal year ended December 31, 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Zuckerberg, Wehner, Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

144.    The 2020 10-K represented that the number Facebook's MAUs in the United States and Canada grew from 248 million to 258 million from December 31, 2019 to December 31, 2020. In addition, the 2020 10-K represented that the number of MAUs in Europe grew from 394 million to 419 million from December 31, 2019 to December 31, 2020.

145.    The 2020 10-K repeated the claim that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.)

146.    The statements identified in ¶¶ 143–45 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (2) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

### *April 9, 2021 Proxy Statement*

147.    On April 9, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

148.    The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; (3) approve an amendment to the director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (4) consider six shareholder proposals, each of which sought to implement certain corporate governance reforms and was opposed by the Company, including (i) proposal

to require Facebook to add a "human/civil rights" expert to the Board by shareholders who "believe Facebook requires expert, board level oversight of civil and human rights issues to assess risk and develop strategy to avoid causing or contributing to widespread violations of human or civil rights;" (ii) a proposal requiring Facebook to publish a report on platform misuse given that "[w]hat was envisioned as a tool to connect people has been co-opted for dissemination of disinformation and violent extremism, which has led to many instances of human suffering and death" and that "[m]anagement and the board have failed to take effective action to stem these abuses, which has resulted in a series of negative impacts[;]" and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platforms given the "exponential growth of CSAM [Child Sexual Abuse Material] is directly tied to the growth of social media and the increasing number of children online."

149.    The 2021 Proxy Statement listed the following factors, under "2020 Priorities and Company Performance Percentage," applicable to first half and second half 2020 executive performance-based compensation:

> ***Continue making progress on the major social issues*** facing the Internet and our company, ***including privacy, safety, and security.***
>
> ***Build new experiences that meaningfully improve people's lives*** today and set the stage for even bigger improvements in the future.
>
> Keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs.
>
> ***Communicate more transparently*** about what we're doing and the role our services play in the world.

(Emphasis added.) The Compensation, Nominating & Governance Committee approved a company performance percentage of ***110%*** based on these factors, notwithstanding the Platform Content Misconduct.

150.    With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated that Facebook's "code of conduct provides guidelines for business conduct and applies to members of our board of directors, our executive officers, employees, contractors, consultants, and others working on our behalf." Moreover, the 2021 Proxy Statement represented that the Company would "satisfy the disclosure

requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our code of conduct by posting such information on our website at the address specified above."

151.    Regarding the "Board Role in Risk Oversight," the 2021 Proxy Statement said:

Our board of directors as a whole has responsibility for overseeing our risk management and believes that a thorough and strategic approach to risk oversight is critical. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by regular reports from our management team, including senior personnel that lead a variety of functions across the business, and from our internal audit department, as well as input from external advisors, as appropriate. These reports are designed to provide timely visibility to the board of directors and its committees about the identification and assessment of key risks, our risk mitigation strategies, and ongoing developments.

The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit & risk oversight committee has responsibility for overseeing certain of our major risk exposures, including in the areas of financial and enterprise risk, legal and regulatory compliance, environmental sustainability, social responsibility, and cybersecurity, as well as risks in other areas as our audit & risk oversight committee deems necessary or appropriate from time to time. Our audit & risk oversight committee also oversees the steps we have taken to monitor or mitigate these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Our board of directors also may exercise direct oversight with respect to these areas or delegate such oversight to committees in its discretion. In addition, our audit & risk oversight committee oversees our internal audit function. Our privacy committee oversees the risks related to privacy and data use matters, including our compliance with the comprehensive privacy program that we adopted in compliance with our FTC consent order and the steps we have taken or plan to take to monitor or mitigate such risks. Our compensation, nominating & governance committee evaluates risks arising from our corporate governance and compensation policies and practices, as more fully described in the section of this proxy statement entitled "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment," and oversees succession planning for our board of directors and certain key executives other than the CEO. Each of these committees provide reports to the full board of directors regarding these and other matters.

152.    In addition, in opposition to the shareholder proposal, described above, calling for a civil/human rights expert to be added to the Board the 2021 Proxy Statement said: "***We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts*** and fight abuse across our services. ***We believe that implementing this proposal is unnecessary because of our continued progress in this area and our***

***efforts to fight abuse across our services***, including our recent appointments in our human rights and civil

rights leadership." Moreover, this section continued that:

> ***Our board of directors and its committees also provide oversight around our efforts in many of these areas.*** In particular, the charter of our audit & risk oversight committee provides that the audit & risk oversight committee will review with management (i) at least annually, our company's assessment of the major ways in which our services can be used to facilitate harm or undermine public safety or the public interest, including through the sharing of content on our services that violate our policies, as well as the steps we have taken to monitor, mitigate, and prevent such abuse, and (ii) from time to time, such other program, policies, and risk exposures related to social responsibility as the audit & risk oversight committee deems necessary or appropriate. ***However, as our board of directors and its committees also have numerous oversight responsibilities in other areas, our board of directors does not believe that setting aside a board seat for any predetermined profile is a good corporate governance practice and may limit the board's ability to identify and recruit the most qualified candidates who must consider a broad range of issues. Therefore, our board of directors recommends that our shareholders vote against this proposal.***

(Emphasis added.)

153. In opposition to the shareholder proposal, described above, calling for the Company to

issue report on platform misuse, the 2021 Proxy Statement said:

> ***We agree that the amplification of false, divisive, hateful, and inciting content is harmful to our community, and we continue to take steps to address this issue as described below. We believe that implementing this proposal is unnecessary due to our transparency efforts to date, the significant progress we continue to make to address these issues***, and our work to help external researchers assess the impact of our efforts in this area as they relate specifically to the U.S. 2020 elections.
>
> ***We work to remove harmful information that violates our policies on our platforms.*** This includes information designed to interfere with people's ability to vote, suppress voting, or claims that people will be infected by COVID-19 (or another communicable disease) if they participate in the voting process. Between March 1, 2020 and Election Day on November 3, 2020 (Election Period), we removed more than 265,000 pieces of content on Facebook and Instagram in the U.S. for violating our voter interference policies. ***We also remove information that breaks our rules on violence, bullying, and harassment, and the other areas outlined in Facebook's Community Standards. We regularly report on our efforts to remove this harmful information from our platforms through our Community Standards Enforcement Report, which we believe sets the industry standard for transparency.*** We update this report on a quarterly basis to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe and inclusive.
>
> We also partner with more than 80 fact-checkers globally who identify and rate content on our platform every day across more than 60 languages. When we have signals that a piece

of content is likely false, we send it to our third-party fact-checkers for review . Our third-party fact-checkers can also find content on their own and ultimately decide what content to review and rate. When claims are debunked by third-party fact-checkers, we reduce their distribution so fewer people see them and we add warning labels with more context for people who may come across them. During the Election Period, we displayed warnings on more than 180 million pieces of content in the U.S. based on the judgment of third-party fact-checkers. Additionally, ads featuring claims debunked by our third-party fact-checkers are rejected. We also work to improve the quality of ads on our platform by requiring advertisers to complete an authorization process before they can run ads covering social issues, elections, and politics in the U.S. During the Election Period we rejected ad submissions 3.3 million times for failure to complete this authorization process.

In addition, we have taken a number of steps to help prioritize News Feed content that is more focused on meaningful interactions for our users. ***In 2018, we made a fundamental change to the way content is surfaced in people's News Feed*** to prioritize posts from friends and family. This was based on extensive research that found people derive more meaningful conversations and experiences when they engage with people they know as opposed to passively consuming content.

***This was one of many changes that we have made to News Feed to try and minimize the amount of divisive content that people see. We have reduced clickbait headlines, reduced links to misleading and spam posts, and improved how comments are ranked to show people those that are more relevant and of higher quality. In addition to these measures to reduce the distribution of this type of problematic content, we also remove content when we find that such content violates our Community Standards or one of our other policies, and we give people more information about the posts they see in News Feed, including information about why they are seeing a particular post and notifications with additional context on the source of certain news and other content.*** Additionally, we make recommendations to help people discover new communities and content. We have Recommendation Guidelines, available in our Help Center, to help people better understand the kinds of content we aim to recommend, and provide context on why some types of content are not included in recommendations, and therefore may not be distributed as widely.

We also regularly partner with external researchers in efforts to better understand the impact of platforms like ours on social issues such as the interaction of technology and democracy. As it relates to the U.S. 2020 elections specifically, we launched a new research partnership with nearly 20 external academics to understand the role that Facebook and Instagram played in this election. This research partnership will examine the impact of how people interact with our products, including content shared in News Feed and across Instagram, and the role of features like content ranking systems. Additionally, in February 2020, we announced that we have substantially increased the amount of data we are providing to 60 academic researchers across 17 labs and 30 universities around the world to help support academic research on social media's role in elections and democracy. In February 2021, for the first time, we provided researchers access to targeting information for more than 1.65 million social issue, electoral, and political ads through the Facebook Open Research & Transparency platform. By making the targeting criteria, such as location and interests, selected by advertisers running social issue, electoral, or political ads

available for analysis and reporting, we hope to help people better understand the practices used to reach potential voters on Facebook and Instagram.

***Given our efforts and transparency around our actions to counter platform misuse, as well as the significant public debate on this topic to date, our board of directors believes that the preparation of the report contemplated by this proposal is unnecessary and not beneficial to our shareholders.*** Therefore, our board of directors recommends that our shareholders vote against this proposal.

(Emphasis added.)

154.    In opposition to the shareholder proposal, described above, calling for the Company to issue a report on child exploitation, the 2021 Proxy Statement said: "***We have robust policies to help protect against child exploitation*** and content or behavior on our platform that puts the safety of children at risk. ***We believe we have led the industry in developing new ways to prevent, detect, and respond to abuse***, which are the three key elements in our strategy to combat abuse." The 2021 Proxy Statement continued that "***[g]iven our active approach to addressing child exploitation . . . our ongoing transparency on this topic***, our board of directors believes that ***the preparation of the report contemplated by this proposal is unnecessary.*** Therefore, our board of directors recommends that our shareholders vote against this proposal. (Emphasis added.)

155.    Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis caused the 2021 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 149–51 by failing to disclose that: (1) though the Company claimed to consider efforts to make progress on the major social issues facing the Company, efforts to build new experiences that meaningfully improve people's lives, and efforts to communicate more transparently with the public in determining the performance-based elements of executive pay, this claim was untrue given that large performance-based awards were granted despite the occurrence of the Platform Content Misconduct; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board's, and its committees', risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

156.     In addition, the 2021 Proxy Statement was materially false and misleading, with regard to the statements in ¶¶ 152–54, and failed to disclose material facts necessary to make the statements made not false and misleading, because the 2021Proxy Statement failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; and (3) the Company failed to maintain internal controls to effect adequate disclosure of the foregoing.

157.     As a result of Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) approve an amendment to the director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (3) reject six shareholder proposals, including (i) a proposal to require Facebook to add a "human/civil rights" expert to the Board; (ii) a proposal requiring Facebook to publish a report on platform misuse; and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platform. The issues addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct, but, due to the false and misleading elements of the 2021 Proxy Statement, remained unaddressed and undisclosed until Frances Haugen eventually came forward.

### April 29, 2021 Form 10-Q

158.     On April 29, 2021, the Company filed with the SEC its quarterly report for the first fiscal quarter ended March 31, 2021 on Form 10-Q (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Wehner, and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

159. The 1Q21 10-Q repeated the claim that the Company "believe[s] *the percentage of duplicate accounts is meaningfully higher in developing markets* such as the Philippines and Vietnam, *as compared to more developed markets.*" (Emphasis added.) The 1Q21 10-Q further reiterated Facebook's commitment to "continue making progress on the major social issues facing the Internet and our company, including privacy, safety, and security" and to "communicate more transparently about what we're doing and the role our services play in the world."

### *May 26, 2021 Shareholder Meeting*

160. On May 26, 2021, the Company held its annual shareholder meeting. At the meeting, a shareholder asked a question concerning the Company's policies with respect to censorship, to which Defendant Clegg responded: "We always strive to enforce our policies evenly without regard to the political affiliation of those affected[.]" He continued that though Facebook supports free expression, "of course, that doesn't mean that politicians can just say things that clearly cause harm and *our policies* on hate speech, incitement and so on *apply to everyone regardless of their position of power.*" Defendant Clegg reiterated: "we're very clear, we remove content that poses specific harm to people, content intended to intimidate, exclude or silence views." (Emphasis added.)

161. In response to another question about the widespread presence of "fake news" on Facebook, Defendant Clegg answered, "remember, we *really are committed to fighting wherever we can the spread of false information* on Facebook" and "*[w]e remove content that violates our Community Standards* . . . and we reduce distribution of stories, which are marked as false. And we . . . try to inform people, so that they decide for themselves what to read, trust, and share."

162. Defendant Zuckerberg also stated during the meeting that, "for the last several years, *our team that has been focused on kind of trust and safety overall, has been more focused on content moderation, so making sure that we can identify harmful content and take it down.*" (Emphasis added.)

### *July 29, 2021 Form 10-Q*

163. On July 29, 2021, the Company filed with the SEC its quarterly report for the second fiscal quarter ended June 30, 2021 on Form 10-Q (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendant Wehner, and contained SOX certifications signed by Defendants Zuckerberg and Wehner attesting to the

accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

164.    The 2Q21 10-Q repeated the claim that the Company "believe[s] ***the percentage of duplicate accounts is meaningfully higher in developing markets*** such as the Philippines and Vietnam, ***as compared to more developed markets.***" (Emphasis added.) The 2Q21 10-Q further reiterated Facebook's commitment to "continue making progress on the major social issues facing the Internet and our company, including privacy, safety, and security" and to "communicate more transparently about what we're doing and the role our services play in the world."

### The Code of Conduct

165.    The Code of Conduct, which Facebook updated on June 7, 2021, also made false and misleading representations regarding the Company's user safety efforts. The Code of Conduct said: "Our reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone." Moreover, the Code of Conduct highlighted the Company's purported commitment to "keep people safe and protect privacy" and stated "we are committed to protecting our communities from harm."

166.    The Code of Conduct further stated the Company's purported commitment to "innovate responsibly by making every effort to anticipate and mitigate potential harms in all that we build" and further asserted that "Facebook is committed to maximizing the positive impact we have on people and society through all that we build." In line with this supposed commitments, the Code of Conduct noted that Facebook "[c]onsider[s] broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others" and that Facebook "[r]aise[s] and address[es] potential harms early and often throughout the product development process."

167.    Moreover, the Code of Conduct asserted that Facebook "[w]ork[s] quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation,

threats of violence and terrorism," and further asserted that "[s]afety is one of our Responsible Innovation Dimensions."

### Facebook's Website

168.    During the Relevant Period, Facebook posted statements to its website concerning user safety and content moderation. For example, during the Relevant Period, Facebook's website said that Facebook was "committed to protecting your voice and helping you connect and share safely" which is "why we have Community Standards that specify what's allowed on our apps, and we remove anything that breaks these rules." Facebook's website also represented that the Company "remove[s] hate speech, harassment, threats of violence and other content that has the potential to silence others or cause harm," and that this included "proactively detect[ing] 95% of hate speech on Facebook that we remove before anyone reports it to us." Facebook's website further represented that Facebook "[w]orks limit the spread of misinformation," which includes "[c]ombating COVID-19 [m]isinformation" and "taking aggressive steps to stop misinformation and harmful content from spreading."

169.    The statements in ¶¶ 158–68 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; (3) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

170.    The truth began emerging on September 13, 2021, when the *Wall Street Journal* published the first of the "Facebook Files," titled "Facebooks Says Its Rules Apply to All. Company Documents

Reveal a Secret Elite That's Exempt." The article cited company documents and an anonymous whistleblower who would later be revealed as Frances Haugen. The article said, in relevant part:

> ***Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame.***
>
> ***In private, the company has built a system that has exempted high-profile users from some or all of its rules***, according to company documents reviewed by The Wall Street Journal.
>
> The program, known as "cross check" or "XCheck," was initially intended as a quality-control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists. ***Today, it shields millions of VIP users from the company's normal enforcement process***, the documents show. ***Some users are "whitelisted"—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come.***
>
> *               *               *
>
> A 2019 internal review of Facebook's whitelisting practices, marked attorney-client privileged, found ***favoritism to those users to be both widespread and "not publicly defensible."***
>
> ***"We are not actually doing what we say we do publicly,"*** said the confidential review. It called the company's actions "a breach of trust" and added: ***"Unlike the rest of our community, these people can violate our standards without any consequences."***
>
> *               *               *
>
> ***For ordinary users, Facebook dispenses a kind of rough justice in assessing whether posts meet the company's rules*** against bullying, sexual content, hate speech and incitement to violence. Sometimes the company's automated systems summarily delete or bury content suspected of rule violations without a human review. At other times, material flagged by those systems or by users is assessed by content moderators employed by outside companies.
>
> *               *               *
>
> ***Users designated for XCheck review, however, are treated more deferentially.*** Facebook designed the system to minimize what its employees have described in the documents as "PR fires"—negative media attention that comes from botched enforcement actions taken against VIPs.
>
> If Facebook's systems conclude that one of those accounts might have broken its rules, they don't remove the content—at least not right away, the documents indicate. They

route the complaint into a separate system, staffed by better-trained, full-time employees, for additional layers of review.

(Emphasis added).

171.    On this news, the price of the Company's common stock fell $5.17 per share to close September 12, 2021 at $376.51 per share.

172.    On September 14, 2021, the *Wall Street Journal* published another article that noted that despite Facebook's attempts to publicly discredit the idea that Instagram negatively affected teenagers, the Company's own internal data showed that it did. The Company's detailed, internal analysis showed that, especially among teenage girls, significant mental health problems stemmed from using Instagram, and that teenage girls themselves linked suicidal throughs and eating disorders to their use of the app. Repeatedly, Facebook's internal researchers found that Instagram was harming large numbers of teenagers using it. In a 2019 internal presentation, Facebook's own researchers shared that "[w]e make body issues worse for one in three teen girls" and that "[t]eens blame Instagram for increases in rates of anxiety and depression." Likewise, in March 2020, in a presentation posted to Facebook's internal message board, Facebook's internal researchers stated that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse."

173.    On September 15, 2021, the *Wall Street Journal* published another article which noted that in 2018, Facebook changed its algorithm that controlled what content appeared on users' News Feeds, resulting in more harmful and objectionable content being shown to some users. This conflicted directly with the statement made by the Company in its 2021 Proxy Statement, explaining why it opposed issuing a platform misuse report. The article revealed that in an internal report produced by Facebook's data scientists, these data scientists concluded that: "Our approach has had unhealthy side effects on important slices of public content, such as politics and news[.]" One data scientist noted that: "This is an increasing liability." Other Facebook memoranda from data scientists noted that as a result of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other internal documents from the article showed that the impetus for the algorithm change in the first place was that Facebook was worried about decreasing user engagement with its platforms, which threatened revenue. Incendiary content led to more frequent user engagement, and thus buoyed revenue.

174.    Following this article, the Company's common stock decline to $373.92 per share.

175.    On September 16, 2021, the *Wall Street Journal* again published an article detailing the Company's ineffectual handling of the use of its platforms by drug cartels and human traffickers. The article noted that in January 2021, a Facebook investigator discovered that a drug cartel was using Facebook to recruit, train, and pay hitmen. Despite sounding the alarm, these pages remained active for moths afterwards, as Facebook did nothing to remove the posts at issue or prevent the group from posting more. This was not unusual, as other documents cited in the article demonstrated that despite Facebook employees raising red flags about the platforms use in a variety of developing countries, the Company often did little or nothing in response. One internal document from March 2021 showed that the prevalence of users, including countries at risk of conflict, using Facebook to promote violence, fan ethnic tensions, and undermine social institutions was profound and that Facebook's "[c]urrent mitigation strategies are not enough." Another internal report concerning the use of the platform by human traffickers noted that: "We have found content violating our domestic servitude policy that should have been detected automatically" by software which Facebook had deactivated in 2020.

176.    On this news, the Company's stock price fell to $373.06 per share.

177.    On September 17, 2021, the *Wall Street Journal* published an article discussing the inability, or unwillingness, of Facebook to appropriately moderate content on its platforms, even for topics on which the Company had staked out clear positions. For example, despite repeated public commitments by Facebook and Defendant Zuckerberg personally that the Company's platforms would be used to communicate accurate public health guidance regarding COVID-19, the Company failed to implement policies that were effective at doing so and from preventing the spread of COVID-19 related disinformation.

178.    On this news the Company's stock price fell to $364.72 per share.

179.    On September 28, 2021, one day after a public announcement by the Company that it was pausing development of its planned Instagram Kids app, the *Wall Street Journal* published a new article relating to the Company's efforts to attract pre-teens to its platforms, stating:

> ***Internal Facebook documents reviewed by The Wall Street Journal show the company formed a team to study preteens, set a three-year goal to create more products for them***

*and commissioned strategy papers about the long-term business opportunities presented by these potential users.* In one presentation, it contemplated whether there might be a way to engage children during play dates.

*"Why do we care about tweens?" said one document from 2020. "They are a valuable but untapped audience."*

\*          \*          \*

On Monday, **Adam Mosseri, head of Instagram, said the company would pause the development of a version of the app for children, often referred to as Instagram Kids.** He said the company wanted time to talk to parents, experts and lawmakers before proceeding. He also contended that underage users would simply lie about their age to access Instagram if a version for children under the age of 13 wasn't available.

\*          \*          \*

*Over the past five years, Facebook has made what it called "big bets" on designing products that would appeal to preteens across its services, according to a document from earlier this year.*

*In more than a dozen studies over that period, the documents show, Facebook has tried to understand which products might resonate with children and "tweens" (ages 10 through 12)*, how these young people view competitors' apps and what concerns their parents.

"With the ubiquity of tablets and phones, *kids are getting on the internet as young as six years old. We can't ignore this and we have a responsibility to figure it out,*" said a 2018 document labeled confidential. "Imagine a Facebook experience designed for youth."

*Earlier this year, a senior researcher at Facebook presented to colleagues a new approach to how the company should think about designing products for children. It provided a blueprint for how to introduce the company's products to younger children.* Rather than offer just two types of products—those for users 13 and older, and a messenger app for kids—Facebook should tailor its features to six age brackets, said a slide titled "where we've been, and where we're going."

\*          \*          \*

In a study about household dynamics, a Facebook user-experience researcher found that although teens often inspired their younger relatives to join Instagram, those same teens also often counseled the tweens not to share too frequently, and not to post things they would later regret.

"I don't know how to get a perfect picture like my sister says you need to post," a tween told the researcher.

*"We need to understand if this influence over preteen sharing holds at scale," the researcher wrote in a document posted to Facebook's internal message board early this year. "If it is common that teens are discouraging preteens from sharing, there are obvious implications for creation and the ecosystem both in the near and longer-term* as preteens are the next generation coming onto the platform." *The presentation cited concern among teenagers about oversharing as a "myth" about Instagram.*

(Emphasis added.)

180.    On this news, the Company's share price further declined to $340.65 per share.

181.    On October 3, 2021, Frances Haugen revealed her identity as the whistleblower in an interview on the *CBS News* show, *60 Minutes*. *CBS* later published an article that same day, including portions of the interview transcribed. The article said, in relevant part:

"The thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook," Haugen said. "*And Facebook, over and over again, chose to optimize for its own interests, like making more money.*"

\*          \*          \*

Haugen told 60 Minutes that *weeks after the 2020 election, Facebook dissolved a department called "Civic Integrity" which worked on risks to elections including misinformation.*

"Like, they basically said, 'Oh good, we made it through the election. There wasn't riots. We can get rid of Civic Integrity now,'" Haugen said. "Fast forward a couple months, we got the insurrection. And *when they got rid of Civic Integrity, it was the moment where I was like, 'I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous.'*"

\*          \*          \*

*Haugen said Facebook's algorithm optimizes for content that generates engagement. That's led to publishers, "realizing that if they produce more content that is angry and divisive and polarizing, they'll get more views," in her words.*

*"Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money,"* Haugen added.

(Emphasis added.)

182.    On October 4, 2021, *CBS News* published an article disclosing that Frances Haugen had previously filed eight complaints with the SEC relating to the Platform Content Misconduct, titled

"Whistleblower's SEC Complaint: Facebook Knew Platform Was Used to 'Promote Human Trafficking and Domestic Servitude. The SEC complaints concerned the following:

a.      Facebook knew its platforms were spreading misinformation, but took inadequate measures in response. This complaint alleged, in relevant part:

Facebook misled investors and the public about its role perpetuating misinformation and violent extremism relating to the 2020 election and January 6th insurrection.

*          *          *

Facebook made misstatements and omissions regarding its facilitation of political misinformation, including in testimony before Congress.

*          *          *

**Facebook only actions less than 1% of Violence and Inciting to Violence (V&I) content on Facebook** – Facebook's strategy of focusing on Content over other solutions lets this content effectively run free[.]

*          *          *

**Facebook has demonstrated via experiments using brand new test accounts how rapidly Facebook's algorithms can veer people interested in Conservative topics into radical or polarizing ideas and groups/pages**, some demonstrating traits of Coordinated Inauthentic Behavior (CIB) akin to what was seen by the Macedonians in 2016[.]

*          *          *

**Pages that repeat offend for misinformation are permitted to continue to spread misinformation**[.]

*          *          *

Facebook has **"whitelisted" political users who violate its terms, leading to the spread of misinformation and violence** on and off the platform.

(Emphasis added.)

b.      Facebook took inadequate steps to combat human traffickers using its platform. This complaint stated, in relevant part:

Facebook misled investors and the public about its promotion of human trafficking / slaver / servitude.

1

*              *              *

2

3 **Internal company documents show that Facebook and Instagram were, and are, being
used to promote human trafficking and domestic servitude.** An internal Facebook record
4 created no later than April 2019 states: **"We have observed increasing number of reported
content that indicates that the platform is being used to coordinate and promote domestic
5 servitude** . . . real world harm caused by domestic servitude as well as risk to the business
due to potential PR fires . . ."

6

7

*              *              *

8 Notably, there was widespread media coverage of an "undercover investigation by BBC
News Arabic" in or around October 2019, which found that **"domestic workers are being
9 illegally bought and sold online in a booming black market . . . on Facebook-owned
Instagram, where posts have been promoted via algorithm-boosted hashtags, and sales
10 negotiated via private messages."**

11

*              *              *

12

13 **However, even after this news coverage, Facebook's regular SEC filings continually
omitted specific references to trafficking, domestic servitude, human slavery, and the
14 Apple App Store escalation.**

15 In fact, Facebook's failure to solve human trafficking and servitude on its platforms
threatened its distribution on the Apple App Store. Moreover, as the enclosed Facebook
16 records show, Facebook's statements about human trafficking were false. For example,
**Facebook has confirmed:** [. . .] **[W]e received communication from Apple where the
17 company threatened to pull FB & IG from its App Store due to them identifying content
promoting 'domestic servitude'** [. . .] However, due to the underreporting of this behaviour
18 and absence of proactive detection, **newly created and existing content not captured in
the IG sweep meant that domestic servitude content remained on the platform.** [. . .] **Was
19 this issue known to Facebook before BBC enquiry and Apple escalation? Yes.** [. . .] **[O]ur
platform enables all three stages of the human exploitation lifecycle (recruitment,
20 facilitation, exploitation)**[.]"

21

22 (Emphasis added.)

23        c.      Facebook's XCheck program gave preferential treatment to certain users. This complaint

24 said, in relevant part:

25 Facebook misled investors and the public about equal enforcement of its terms given that
high-profile users are "whitelisted" under its "XCheck" program.

26

27

*              *              *

28

*[O]ver the years, many XChecked people & entities have been exempted from enforcement. That means, for a select few members of our community, we are not enforcing our policies and standards.* Unlike the rest of our community, these people can violate our standards without any consequences[.]

*                *                *

We are exempting certain people and businesses from our policies and standards [. . .] ***This undermines our fairness and legitimacy efforts; creates legal and compliance risks for the company . . . Based on an initial company-wide audit, this problem is pervasive across the country[.]***

(Emphasis added.)

   d.  Facebook misled investors and the public concerning its use in fanning  ethnic violence and global division. This complaint stated, in relevant part:

Facebook misled investors and the public about bringing "the world closer together" where it relegates international users and promotes global division and ethnic violence.

*                *                *

***Facebook's shareholders proposed having a human/civil rights expert on the board, stating:***

"In September 2020, *a Facebook employee reported Facebook ignored global political manipulation from foreign governments seeking to 'abuse our platform on vast scales to mislead their own citizenry.'* [. . .]

Children's rights organization Plan International found **online attacks against girls globally are most prevalent on Facebook.**

*                *                *

***In Myanmar, where violence against the Rohingya 'bears the hallmarks of genocide,' a Facebook commissioned human rights report showed the company 'created an enabling environment.' In Ethiopia, Facebook's platform amplified ethnic tensions and calls for genocide, inciting violence.***

***In rejecting that shareholder proposal, Facebook represented:***

"We recognize the need to protect and respect both civil and human rights and we have made, and continue to make, significant progress on both of these fronts and fight abuse across our services. *We believe that implementing this proposal is unnecessary because of our continued progress in this area and our efforts to fight abuse across our services*. . ."

*                *                *

***FIRST, Facebook Lacks Adequate Resources for International Issues.***

\*          \*          \*

Global Remit [n.b. budget] "US – 87%, ROW [Rest of World] (India, France, Italy) – 13%.

\*          \*          \*

***SECOND, Documents Show that Facebook's Language Capabilities are Inadequate, Leading to Global Misinformation and Ethnic Violence.***

[. . .] Facebook documentation outlines:

[. . .] ***[I]n the Afghanistan market, the action rate for Hate Speech is worryingly low at 0.23 per cent[.]***

\*          \*          \*

In particular, Facebook's written translations (in limited languages) do not account for regions where significant users cannot read.

\*          \*          \*

Nor do they appropriately manage different dialects:

"Arabic is not one language, truly, rather it is better to consider it a family of languages – many of which are mutually incomprehensible . . . [in other dialects] ***they will still misunderstand cultural or contextual content, which is key to problem areas such as Hate Speech and even Terrorism.*** [. . .] [A]s every Arabic nation save Western Sahara is on the At-Risk Countries list and ***deals with such severe issues as terrorism and sex trafficking--it is surely of the highest importance to put more resources to the task of improving Arabic systems.***"

\*          \*          \*

***THIRD, Documents Confirm That Facebook's Actions and Choices Facilitated Harmful Content and Misinformation Around the World***

\*          \*          \*

"***40% of Sampled Top VPV [View Port Views] Civic Posters in West Bengal Were Fake/Inauthentic.*** [. . .] The message comes to dominate the ecosystem with over 35% of members having been recommended a cell group by our algorithms."

\*          \*          \*

"*Hate Speech Classifier[s] for Myanmar/Burmese . . . hate speech text classifier . . . currently being used in production / being maintained? . . . it doesn't look like it's currently in use?*"

(Emphasis added.)

e.  Facebook inflated its advertising reach and key user demographics. This complaint stated in relevant part:

For years, Facebook has misled investors and advertisers about shrinking user base in important demographics, declining content production, and the true number of recipients of "Reach & Frequency" advertising[.]

*          *          *

*Facebook has failed to disclose internal data showing a contraction of the user base in important demographics, including American teenagers and young adults. The company has also hidden the extent to which content production per user has been in long-term decline.*

*          *          *

Internal documents show that youth and teens, a crucial demographic for advertisers, are deliberately targeted for Instagram in order to bring their family members onto Facebook platforms:

"Teens shape the household's perception of Instagram. [. . .] Family-first acquisition strategies are proven effective (e.g. TikTok) and warrant exploration on IG [Instagram]."

*          *          *

*Facebook is inflating it's [sic] growth numbers by not disclosing that a higher fraction of teen accounts are "Same User with Multiple Accounts" (SUMAs), or duplicate accounts.* In terms of teen users, records indicate:

*"Over 15% of new teen accounts are existing users creating a SUMA child [secondary] account."*

*Internal records confirm how teens and young adults in more developed economies are using the platform less.*

"Facebook's teen and young adult DAU [Daily Active Users] has been in decline since 2012/2013. [. . .]"

*"The United States is among the first countries where we observed teen MAP [Monthly Active People] decline, starting in 2012* . . . teens have been taking longer to adopt

Facebook . . . One immediately concerning takeaway . . . is a flattening growth trends for cohorts below 18 years[.]"

\*          \*          \*

***Although Facebook has sophisticated algorithms to assess the existence of SUMAs / duplicate accounts, Facebook is well aware that its failure to include SUMA duplicate accounts distorts its Reach & Frequency (R&F) advertising models***:

"Previous analysis have [sic] shown that including SUMA modeling into audience sizes would ***reduce overestimation of population in age groups for our top 30 ad markets by 50% when included by itself and by 63% when included in conjunction with age modeling.***"

By delivering too many ads to users that the advertisers did not want to pay for, ***Facebook overcharged advertisers on a vast scale***:

"But wont' [sic] this cause the R&F [reach and frequency] to violate their contract? ***If the ads is [sic] targeted to 1M accounts with a guarantee of 90%, and we deliver to 900k accounts but only 800k users [due to SUMA], wont' [sic] this make R&F [reach and frequency] pay penalty if we report 800k as coverage?***["]

(Emphasis added.)

183.    On this news, the Company's share price dropped to $326.23.

184.    On October 21, 2021, after the market had closed, the *Wall Street Journal* published another article concerning the Company, reporting that its own internal research undermined the accuracy and reliability of its publicly reported user figures. Specifically, the Company's internal research found that new users who created multiple accounts were often undercounted in the Company's count of "single users with multiple accounts ("SUMA"). New SUMA users were described in one Company presentation as, "very prevalent." An internal May 2021 memorandum by a Facebook employee noted that the number of monthly Facebook users in the U.S. in their twenties actually exceeded the number of people in their twenties in the U.S., a metric which "brings out the elephant in the room: SUMA." The memorandum noted that this discrepancy could make Facebook's ratio of daily active users "less trustable." The *Wall Street Journal* article continued by noting that the prevalence of duplicate accounts could have a meaningful impact on the Company's advertising revenue, given that the price paid by advertisers was based on how many members of the target demographic advertisers could reach using Facebook.

185.   On this news, the price of the Company's stock dropped from $341.88 per share at the close of trading on October 21, 2021, to $324.61 at the close of trading on October 22, 2021, a drop of $17.27, or approximately 5.1%. From the market's close on September 10, 2021 (the last trading day before the truth began emerging on September 13, 2021) to its close on October 22, 2021, the Company's stock dropped $54.08, or approximately 14.3%.

186.   Moreover, on October 22, 2021, the *Washington Post* revealed that another whistleblower had filed a complaint with the SEC, alleging similar misconduct as Frances Haugen had.

### *Subsequent Developments*

187.   On December 6, 2021, anonymous plaintiff Jane Doe—"a Rohingya Muslim refugee" who now resides in Illinois—brought a putative class action against the Company in the Superior Court of the State of California for the County of San Mateo (the "Rohingya Class Action"). Jane Doe's complaint seeks damages in excess of $150 billion related to Facebook's engagement in the Platform Content Misconduct.

188.   Specifically, the Rohingya Class Action asserts that Facebook, as part of the Platform Content Misconduct, knowingly promulgated and facilitated the dissemination of anti-Rohingya hate speech. These actions in turn led to violence against the Rohingya people in Myanmar, culminating in a massacre of "dozens of Rohingya villages" in August 2017. The Rohingya Class Action asserts that Facebook is still engaged in this "misinformation campaign" in Myanmar to this day.

189.   The Rohingya Class Action was removed to the United States District Court for the Northern District of California on January 5, 2022 and is currently pending before Judge Yvonne Gonzales Rogers.

### **REPURCHASES**

190.   During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

191.   According to the 2Q21 10-Q, between June 1, 2021 and June 30, 2021, inclusive, certain of the Individual Defendants caused the Company to repurchase 9,289,000 shares of its own common

stock at an average price per share of $336.42 for a total cost to the Company of approximately $3.1 billion.

192.    As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by approximately $110 million for these repurchases.

193.    According to the Form 10-Q that the Company filed with the SEC on October 26, 2021 (the "3Q21 10-Q"), between July 1, 2021 and July 31, 2021, inclusive, certain of the Individual Defendants caused the Company to repurchase 8,586,000 shares of its own common stock at an average price per share of $352.32 for a total cost to the Company of approximately $3.0 billion.

194.    As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by approximately $238 million for these repurchases.

195.    According to the 3Q21 10-Q, between August 1, 2021 and August 31, 2021, inclusive, certain of the Individual Defendants caused the Company to repurchase 9,548,000 shares of its own common stock at an average price per share of $361.87 for a total cost to the Company of approximately $3.5 billion.

196.    As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by approximately $356 million for these repurchases.

197.    According to the 3Q21 10-Q, between September 1, 2021 and September 30, 2021, inclusive, certain of the Individual Defendants caused the Company to repurchase 22,144,000 shares of its own common stock at an average price per share of $356.24 for a total cost to the Company of approximately $7.9 billion.

198.    As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by approximately $700 million for these repurchases.

199.    According to the Company's Form 10-K filed by the Company on February 3, 2022, between October 1, 2021 and October 31, 2021,[2] inclusive, certain of the Individual Defendants caused

---

[2] Upon information and belief, at least some of these repurchases happened prior to the close of the market on October 21, 2021.

the Company to repurchase 21,703,000 shares of its own common stock at an average price per share of $326.20 for a total cost to the Company of approximately $7.1 billion.

200.    As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by approximately $34.5 million for these repurchases.

201.    Thus, in total, from June 1, 2021 until October 31, 2021, the Company paid approximately $24.6 billion for approximately 71,270,000 shares of its own common stock. As the Company's common stock was only worth $324.61 per share, the price at closing on October 22, 2021, the Company overpaid by over $1.4 billion.

## DAMAGES TO FACEBOOK

202.    As a direct and proximate result of the Individual Defendants' conduct, Facebook has lost and expended, and will lose and expend, many millions of dollars.

203.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and certain of its officers, the Rohingya Class Action filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

204.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Platform Content Misconduct.

205.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

206.    Such losses also include, but are not limited to, the more than $1.4 billion which the Individual Defendants caused the Company to overpay to repurchase its own common stock during the Relevant Period when the Company's common stock was trading at artificially inflated prices due to the false and misleading statements at issue.

207.    As a direct and proximate result of the Individual Defendants' conduct, Facebook has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will

plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

208.    Plaintiff brings this action derivatively and for the benefit of Facebook to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Facebook, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

209.    Facebook is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

210.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Facebook. Plaintiff will adequately and fairly represent the interests of Facebook in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

211.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

212.    A pre-suit demand on the Board of Facebook is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Zuckerberg, Sandberg, Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis (collectively, the "Director-Defendants"), along with nonparty Tony Xu (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of ten Directors that were on the Board at the time this action was commenced.

213.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit the Company to engage in the Platform Content Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts. While the price of the Company's common stock was artificially inflated by their misconduct, the

Director-Defendants further breached their fiduciary duties by causing the Company to overpay by more than $1.4 billion to repurchase approximately 71,270,000 shares of its own common stock between June 1, 2021 and October 31, 2021. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

214.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing or permitting the Company to engage in the Platform Content Misconduct and making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

215.    Additional reasons that demand on Defendant Zuckerberg is futile follow. Defendant Zuckerberg has served as the Company's CEO since founding the Company in 2004, and has also been Chairman of the Board since 2012. As such, the Company provides Defendant Zuckerberg with his principal occupation. Thus, as the Company admits, he is a non-independent director. As CEO and Chairman throughout the Relevant Period, Defendant Zuckerberg was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 3Q16 10-Q, 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, 2020 10-K, 1Q21 10-Q, and 2Q21 10-Q, each of which he personally signed and/or signed SOX certifications for. Moreover, as described above, he personally made a false and misleading statement at the May 26, 2021 shareholder meeting. In addition, he solicited the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement, each of which contained false and misleading elements which contributed, *inter alia*, to his reelection to the Board. Moreover, the false and misleading elements of the 2019 Proxy Statement led Company shareholders to approve, on an advisory basis, Defendant Zuckerberg's compensation. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $2.6 billion in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Zuckerberg is a defendant in the Securities Class Actions. For these reasons, too, Defendant Zuckerberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.     Additional reasons that demand on Defendant Sandberg is futile follow. Defendant Sandberg has served as the Company's COO March 2008 and as a Company director since June 2012. As such, the Company provides Defendant Sandberg with her principal occupation for which she receives substantial compensation, as detailed above. Thus, as the Company admits, she is a non-independent director. Defendant Sandberg was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, each of which she signed. In addition, she solicited the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement, each of which contained false and misleading elements which contributed*, inter alia*, to her reelection to the Board. Moreover, the false and misleading elements of the 2019 Proxy Statement led Company shareholders to approve, on an advisory basis, Defendant Sandberg's compensation. As the Company's COO and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Sandberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

217.     Additional reasons that demand on Defendant Alford is futile follow. Defendant Alford has served as a Company director since May 2019. She also serves as a member of the Audit & Risk Oversight Committee and the Privacy Committee. Defendant Alford has received and continues to receive significant compensation for her role as a director as described herein, including over $500,000 in the

Fiscal Year 2020. Defendant Alford was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2019 10-K and 2020 10-K, both of which she signed. In addition, she solicited the 2020 Proxy Statement and 2021 Proxy Statement, each of which contained false and misleading elements which contributed, *inter alia*, to her reelection to the Board as well as shareholder approval of the director compensation plan under which she received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). Moreover, she personally benefitted from the false and misleading elements of the 2019 Proxy Statement, which led Company shareholders to elect her to the Company's board in the first place. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Alford breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Andreessen is futile follow. Defendant Andreessen has served as a Company director since June 2008. He also serves as a member of the Compensation, Nominating & Governance Committee. Defendant Andreessen has received and continues to receive significant compensation for his role as a director as described herein. Defendant Andreessen was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, each of which he signed. In addition, he solicited the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board as well as shareholder approval of the director compensation plan under which he received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor

such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Andreessen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Houston is futile follow. Defendant Houston has served as a Company director since February 2020. He also serves as a member of the Compensation, Nominating & Governance Committee. Defendant Houston has received and continues to receive significant compensation for his role as a director as described herein, including over $1.5 million in Fiscal Year 2020. Defendant Houston was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2020 10-K, which he signed. In addition, he solicited the 2020 Proxy Statement and 2021 Proxy Statement, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board as well as shareholder approval of the director compensation plan under which he received unjust compensation (as to the 2020 Proxy Statement) and amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Houston breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Killefer is futile follow. Defendant Killefer has served as a Company director since March 2020. She also serves as Chair of the Privacy Committee and as a member of the Audit & Risk Oversight Committee. Defendant Killefer has received and continues to receive significant compensation for her role as a director as described herein, including over $1.6 million in Fiscal Year 2020. Defendant Killefer was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2020 10-K, which she signed. In addition, she solicited the 2020 Proxy Statement and

2021 Proxy Statement, each of which contained false and misleading elements which contributed, *inter alia*, to her reelection to the Board as well as shareholder approval of the director compensation plan under which she received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Killefer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

221. Additional reasons that demand on Defendant Kimmitt is futile follow. Defendant Kimmitt has served as a Company director since March 2020. He also serves as a Lead Independent Director and as a member of the Privacy Committee. Defendant Kimmitt has received and continues to receive significant compensation for his role as a director as described herein, including over $1.7 million in Fiscal Year 2020. Defendant Kimmitt was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2020 10-K, which he signed. In addition, he solicited the 2020 Proxy Statement and 2021 Proxy Statement, each of which contained false and misleading elements which contributed, *inter alia*, to his reelection to the Board as well as shareholder approval of the director compensation plan under which he received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kimmitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222. Additional reasons that demand on Defendant Thiel is futile follow. Defendant Thiel has served as a Company director since April 2005. He also serves as Chair of the Compensation, Nominating

& Governance Committee. Defendant Thiel has received and continues to receive significant compensation for his role as a director as described herein. Defendant Thiel was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2016 10-K, 2017 10-K, 2018 10-K, 2019 10-K, and 2020 10-K, each of which he signed. In addition, he solicited the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement, each of which contained false and misleading elements which contributed*, inter alia*, to his reelection to the Board as well as shareholder approval of the director compensation plan under which he received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thiel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant Travis is futile follow. Defendant Travis has served as a Company director since March 2020. She also serves as Chair of the Audit & Risk Oversight Committee. Defendant Travis has received and continues to receive significant compensation for her role as a director as described herein, including over $1.6 million in the Fiscal Year 2020. Defendant Travis was responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the 2020 10-K, which she signed. In addition, she solicited the 2020 Proxy Statement and 2021 Proxy Statement, each of which contained false and misleading elements which contributed*, inter alia*, to her reelection to the Board as well as shareholder approval of the director compensation plan under which she received unjust compensation (as to the 2020 Proxy Statement) and an amendment thereto (as to the 2021 Proxy Statement). As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Platform Content Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. For these reasons, too, Defendant Travis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

224.    Additional reasons that demand on the Board is futile follow.

225.    Among others, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel solicited the 2019 Proxy Statement, which contained shareholder proposals calling for general corporate governance reforms, as well as practices which would have directly confronted aspects of the Platform Content Misconduct. A shareholder proposal in the 2019 Proxy Statement called for a Content Governance Report describing the Company's "strategies and policies on content governance, ***including the extent to which they address human rights abuses and threats to democracy and freedom of expression, and the reputational, regulatory, and financial risks posed by content governance controversies***." (Emphasis added.) The inadequacy of the Company's strategies and policies in this area, and the extent to which human rights abuses and threats to democracy and freedom of expression were permitted on the Company's platforms, would be a key revelation from Frances Haugen's disclosures concerning the Platform Content Misconduct. The Company suffered substantial harm as a result of the Platform Content Misconduct and its subsequent revelation, and so these matters posed a significant reputational, regulatory, and financial risk at the time shareholders proposed this Content Governance Report. Nevertheless, despite the ongoing Platform Content Misconduct, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel represented that a Content Governance Report was unnecessary, *inter alia*, "[***g]iven the breadth of our previous disclosures concerning our content policies, and our intent to continue to provide transparency around our policies***." However, as evidenced by the Platform Content Misconduct and the subsequent whistleblowing regarding it, the Company was providing woefully inadequate disclosures regarding its content policies and was not transparent around them. For these additional reasons, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel breached their fiduciary duties and violated Section 14(a) of the Exchange Act, face a substantial likelihood of liability, are, therefore, neither disinterested nor independent, and demand is excused as to each of them.

226.     Moreover, each of the nine Director-Defendants solicited the 2020 Proxy Statement and the 2021 Proxy Statement, which contained shareholder proposals calling for general corporate governance reforms, as well as practices which would have directly confronted aspects of the Platform Content Misconduct. Both the 2020 Proxy Statement and the 2021 Proxy Statement contained shareholder proposals calling for an expert on human/civil rights to be added to the Company's Board and for the publication of a report regarding, *inter alia*, the risk of sexual exploitation of children posed by the Company's privacy tools and the impacts and limits of detection technologies and strategies. The 2020 Proxy Statement also contained a shareholder proposal calling for the Company to prepare a report on civil and human rights risk facing the Company. The 2021 Proxy Statement contained a shareholder proposal calling for a report on ***platform misuse***—citing posts inciting genocide in Myanmar, the Cambridge Analytica data misuse scandal, the exploits of Russian hackers to affect the 2016 U.S. presidential election, the presence of over 45 million images of child pornography and torture, political advertisements which contained lies and disinformation, hate speech calling for anti-immigrant violence, and Libyan Facebook users use of the Company's platforms to buy weapons and locate and kill adversaries—and the benefits and drawbacks of permanently maintaining enhanced actions taken during the 2020 U.S. presidential election cycle. As detailed above, the Director-Defendants opposed each of these proposals and concocted various reasons why these proposals were unnecessary given the Company's existing efforts and purported transparency. As would be revealed by Frances Haugen's disclosure of the Platform Content Misconduct, the Company's efforts in these areas were woefully inadequate and the Company was not being transparent, or indeed truthful, about its policies and practices in these areas. Thus, each of the Director-Defendants caused or permitted the inclusion of materially false and misleading statements in the 2020 Proxy Statement and 2021 Proxy Statement. These materially false and misleading statements caused shareholders to vote down proposals which sought to directly address certain aspects of the Platform Content Misconduct. Thus, the Director-Defendants caused the Platform Content Misconduct to go unaddressed and undisclosed, despite shareholders attempts to implement policies and procedures which would have addressed or disclosed this misconduct. For these additional reasons, each of the nine Director-Defendants breached their fiduciary duties, violated Section 14(a) of

the Exchange Act, faces a substantial likelihood of liability, is neither disinterested nor independent, and demand is excused as to each of them.

227.     Demand in this case is further excused because each the Directors are beholden to and controlled by Defendant Zuckerberg, who is founder, CEO, Chairman, and a controlling shareholder with control over 57.7% of total voting power as of March 31, 2021. In light of this of this, the Directors cannot impartially consider a demand against Defendant Zuckerberg, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Sandberg who is also an executive at Facebook. Thus, all the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Zuckerberg's control over them.

228.     Moreover, as described above, Defendant Zuckerberg directly engaged in insider trading, in violation of federal law. While in possession of material non-public information, Defendant Zuckerberg received proceeds in excess of $2.5 billion as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and further excused.

229.     Additionally, the Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Sandberg and Killefer worked together at McKinsey & Company in 1995 and 1996, and again worked together at the U.S. Department of the Treasury from 1997 to 2000, during a portion of which time Defendant Sandberg was working as Chief of Staff and Defendant Killefer was Assistant Secretary for Management, CFO, and COO. In addition, Defendants Alford and Andreessen had overlapping tenures at eBay Inc. ("eBay"). From 2008 to 2014, Defendant Andreessen served on eBay's board of directors, while Defendant Alford served in a variety of roles at two different eBay subsidiaries. Defendant Alford also served as CFO and Head of Operations at the Chan Zuckerberg Initiative—a philanthropic endeavor of Defendant Zuckerberg's—from 2017 to 2019. In addition, Defendants Zuckerberg, Sandberg, Andreessen, and Thiel have worked together at the Company for well over a decade, with Defendant Zuckerberg founding the

Company in 2004, Defendant Thiel joining the Board in 2005, and Defendants Andreessen and Sandberg both joining the Company in 2008. They have all served together with Defendant Wehner for almost a decade, with Defendant Wehner having joined the Company in 2012. Moreover, companies at which Defendants Alford, Andreessen, Houston, and Travis are primarily employed or serve on the board have advertised using the Company's platforms. In addition, PayPal Holdings, Inc. (Defendant Alford's primary employer) and Dropbox, Inc. (where Defendant Houston is CEO and Chairman of the Board) have received payments from the Company for services rendered. Further still, two companies affiliated with Defendant Andreessen—Coinbase Global, Inc. (where he is a director) and Andreessen Horowitz, a venture capital firm affiliated with Defendant Andreessen—are members, along with Facebook, in the Diem Association, which seeks to establish and manage a blockchain-based payment system that will be affiliated with the Company. Finally, Defendant Kimmitt serves as senior international legal counsel at Wilmer Cutler Pickering Hale and Dorr LLP, which provides legal services to Facebook. These numerous conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question each other's and the remaining Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

230.    Defendants Alford, Killefer, and Travis (as Chair) (collectively, the "Audit Committee Defendants"), served on the Company's Audit & Risk Oversight Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial statements, its share repurchase program, the Company's risk management and assessment functions including major financial risk and enterprise exposures, major legal and regulatory compliance risk exposures, "the Company's assessment of the major ways in which its services can be used to facilitate harm or undermine public safety or the public interest," and the Company's system of internal controls. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately review the Company's SEC filings, causing or permitting the Company to repurchase approximately 71,270,000 shares of the Company's common stock at artificially inflated prices, failing to adequately exercise their risk management function including without limitation their responsibility to assess "the major ways in which [Facebook's] services can be used to facilitate harm

or undermine public safety or the public interest," and failing to ensure the Company had an adequate system of internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

231.    Defendants Andreessen, Houston, and Thiel (as Chair) (collectively, the "Compensation Committee Defendants"), served on the Compensation, Nominating & Governance Committee during the Relevant Period, with Defendant Thiel on the Compensation, Nominating & Governance Committee at the time the 2019 Proxy Statement was solicited, Defendants Andreessen and Thiel on the Compensation, Nominating & Governance Committee at the time the 2020 Proxy Statement was solicited, and all three on the Compensation, Nominating & Governance Committee at the time the 2021 Proxy Statement was solicited. As such, and as detailed above, they approved the high performance percentages, which translated into bonuses for Company executives, despite the Platform Content Misconduct contravening numerous factors which were nominally to be considered in the awarding of such compensation, including, without limitation "making progress on the major social issues" facing Facebook, "build[ing] new experiences that meaningfully improve people's lives today[,]" and "communicat[ing] more transparently about what we're doing[.]" Therefore, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

232.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to engage in the Platform Content Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act lawfully, honestly, ethically and in the best interests of Facebook, failing to promptly report known violations of the Code of Conduct and the law, failing to properly respond to events that undermine the confidentiality, integrity, or availability of data for which Facebook is responsible, failing to design and build products that prioritize safety and privacy, failing to create accurate records, and failing to communicate honestly and transparently. Moreover, one of the Defendant Zuckerberg violated the Code of Conduct by engaging in insider trading. Thus, the

Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

233.    Facebook has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Facebook any part of the damages Facebook suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

234.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

235.    The acts complained of herein constitute violations of fiduciary duties owed by Facebook's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

236.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Facebook. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Facebook, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for

the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

237.    If there is no directors' and officers' liability insurance, then the Directors will not cause Facebook to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

238.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis for Violations of Section 14(a) of the Exchange Act

239.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

240.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

241.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

242.    Under the direction and watch of the Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis,[3] the 2019 Proxy

---

[3] The claim for violation of Section 14(a) of the Exchange Act against Defendants Bowles, Desmond-Hellman, and Hastings is only as to the statements made in the 2019 Proxy Statement. The claim for violation of Section 14(a) of the Exchange Act against Defendants Alford, Houston, Killefer, Kimmitt, and Travis is only as to the statements made in the 2020 and 2021 Proxy Statement. The claim for violation

Statement, 2020 Proxy Statement, and 2021 Proxy Statement failed to disclose that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; (3) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

243.   Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis also caused the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed to consider certain factors in determining the performance-based elements of executive pay, this claim was untrue given that large performance-based awards were granted despite the occurrence of the Platform Content Misconduct and numerous duplicate and fake accounts inflating MAU growth; (2) though the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board's, and its committees', risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

244.   In the exercise of reasonable care, the Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the

---

of Section 14(a) of the Exchange Act against Defendants Andreessen, Sandberg, Thiel, and Zuckerberg is as to the statements made in all three proxy statements.

matters set forth for shareholder determination in the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement, including but not limited to, election of directors.

245.    The false and misleading elements of the 2019 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Desmond-Hellmann, Sandberg, Thiel, and Zuckerberg to the Board, allowing them to continue or being breaching their fiduciary duties to the Company; (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Zuckerberg, Wehner, and Sandberg who were breaching their fiduciary duties to the Company; (3) choose, in a non-binding vote, that future non-binding advisory votes on executive compensation should occur every three years, reducing shareholder's ability to tangibly voice their concerns regarding management who were then breaching their fiduciary duties to the Company; and (4) to reject eight shareholder proposals to improve corporate governance, including one proposal to require Facebook to publish a "Content Governance Report" which would have required the Company to discuss the issues that lay at the heart of the Platform Content Misconduct.

246.    The false and misleading elements of the 2020 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) approve a director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis, each of whom was breaching their fiduciary duties to the Company; and (3) reject eight shareholder proposals to improve corporate governance, including (i) a proposal to require Facebook to add a "human/civil rights" expert to the Board; (ii) a proposal requiring Facebook to publish a civil and humans right risk report; and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platforms. The issues addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct.

247.    The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Sandberg, Thiel, Travis, and Zuckerberg to the Board, allowing them to continue breaching their fiduciary duties to the

Company; (2) approve an amendment to the director compensation policy for non-employee directors, including Defendants Alford, Andreessen, Houston, Killefer, Kimmitt, Thiel, and Travis; and (3) reject six shareholder proposals, including (i) a proposal to require Facebook to add a "human/civil rights" expert to the Board; (ii) a proposal requiring Facebook to publish a report on platform misuse; and (iii) a proposal requiring the Company to issue a report about child sexual exploitation on the Company's platform. The issues addressed by these rejected shareholder proposals were all implicated by the Platform Content Misconduct.

248.     The Company was damaged as a result of Defendants Zuckerberg, Alford, Andreessen, Bowles, Desmond-Hellmann, Hastings, Houston, Killefer, Kimmitt, Sandberg, Thiel, and Travis's material misrepresentations and omissions in the 2019 Proxy Statement, 2020 Proxy Statement, and 2021 Proxy Statement.

249.     Plaintiff on behalf of Facebook has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

250.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Facebook's business and affairs.

252.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

253.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Facebook.

254.     In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Platform Content Misconduct

255.    In further breach of their fiduciary duties owed to Facebook, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Facebook was engaged in the Platform Content Misconduct, which included facilitating criminal activity, causing harm to users, unequally applying content moderation policies, and targeting children despite knowing the harm the Company's products posed to them; (2) despite knowing of the Platform Content Misconduct, the Company was not engaged in meaningful efforts to remediate it; (3) the Company was disclosing user metrics which it knew were inflated by duplicate and fake accounts; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Facebook's public statements were materially false and misleading at all relevant times.

256.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

257.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

258.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2.5 billion, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. In addition, in breach of their fiduciary duties, the Individual Defendants caused the Company, to repurchase approximately 71,270,000 shares of its own stock for about $24.6 billion. Given that, during this time, the Company's stock was only worth $324.61 per share, the price at close on October 22, 2021, the Company overpaid by over $1.4 billion.

259.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose

such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

260.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in Platform Content Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Platform Content Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Platform Content Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

261.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

262.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Facebook has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

263.    Plaintiff on behalf of Facebook has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

264.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Facebook.

266.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Facebook that was tied to the performance or artificially inflated valuation of Facebook, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

267.    Plaintiff, as a shareholder and representative of Facebook, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

268.    Plaintiff on behalf of Facebook has no adequate remedy at law.

### FOURTH CLAIM

#### Against the Individual Defendants for Abuse of Control

269.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

270.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Facebook, for which they are legally responsible.

271.    As a direct and proximate result of the Individual Defendants' abuse of control, Facebook has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

272.    Plaintiff on behalf of Facebook has no adequate remedy at law.

### FIFTH CLAIM

#### Against the Individual Defendants for Gross Mismanagement

273.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

274.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently

managing the assets and business of Facebook in a manner consistent with the operations of a publicly-held corporation.

275.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Facebook has sustained and will continue to sustain significant damages.

276.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

277.    Plaintiff on behalf of Facebook has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

278.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

279.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Company is doing the Securities Class Actions and Rohingya Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

280.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

281.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

282.    Plaintiff on behalf of Facebook has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and
### Rule 10b-5 of the Exchange Act

283.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

284.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Facebook. Not only is Facebook now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the

unlawful scheme perpetrated upon Facebook by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase billions of dollars of its own shares at artificially-inflated prices, damaging Facebook.

285.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements and filings with the SEC.

286.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, nonpublic information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Facebook not misleading.

287.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Facebook. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

288.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

289.    Plaintiff on behalf of Facebook has no adequate remedy at law.

### EIGHTH CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

290.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

291.    The Individual Defendants, by virtue of their positions with Facebook and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Facebook and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Facebook and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

292.    Plaintiff on behalf of Facebook has no adequate remedy at law.

### NINTH CLAIM
**Against Defendants Zuckerberg, Wehner, and Clegg for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

293.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

294.    Facebook, along with Defendants Zuckerberg, Wehner, and Clegg, are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Zuckerberg's, Wehner's, and Clegg's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of Facebook.

295.    Defendants Zuckerberg, Wehner, and Clegg, because of their positions of control and authority as controlling shareholder, officers, and/or director of Facebook, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Facebook, including the wrongful acts complained of herein and in the Securities Class Actions.

296.    Accordingly, Defendants Zuckerberg, Wehner, and Clegg are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

297.    As such, Facebook is entitled to receive all appropriate contribution or indemnification from Defendants Zuckerberg, Wehner, and Clegg.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Facebook, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Facebook;

(c)    Determining and awarding to Facebook the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Facebook and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Facebook and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Facebook to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Facebook restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 14, 2022                    Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

*/s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

THE BROWN LAW FIRM, P.C.
Timothy Brown
767 Third Avenue
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Mark Sloan, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of January, 2022.

12/14/2020

DocuSigned by:

171092E7AD9E474...

MARK SLOAN